In re TELECTRONICS PACING SYS-TEMS, INC., Accufix Atrial "J" Leads Products Liability Litigation.

No. MDL–1057.

United States District Court, S.D. Ohio, Western Division.

July 16, 1996.

Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Richard S. Wayne, Strauss & Troy, Cincinnati, OH, Ron Parry, Arnez, Parry & Wentz, Covington, KY, for plaintiff-liaison counsel.

Charles P. Goodell, Jr., Richard M. Barnes, Ian Gallacher, Goodell, DeVries, Leech & Gray, LLP, Baltimore, MD, Frank C. Woodside, III, James A. Comedeca, Dinsmore & Shohl, Cincinnati, OH, for defendants.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on the Plaintiffs' motion for reconsideration of our decision not to certify punitive damages (doc. 126), the Defendants' memorandum in opposition (doc. 138), and the Plaintiffs' reply (doc. 143). Additionally, the Defendants filed a motion for reconsideration based upon *In re American Medical Systems, Inc.,* 75 F.3d 1069 (6th Cir.1996) (doc. 141), the Plaintiffs filed a memorandum in opposition (doc. 152), and the Defendants filed a reply (doc. 162). The Defendants also filed a supplemental memorandum (doc. 173). The Court held a status conference on May 31, 1996, at 3:00 P.M., where the Court and parties discussed these issues. At that conference, the Court requested that the parties provide the Court with a survey of the distinctions in state law. The Plaintiffs filed a survey of the law (doc. 184), and the Defendants also filed a supplemental brief detailing the different states' laws (doc. 185).

In rendering this decision, the Court has considered, among other things, the evolution of the law in light of recent Courts of Appeals' decisions, the thoughtful and well-written briefs of all parties, and the state of tort law around the country. The Court recognizes that in decertifying the class, it recants positions previously taken. In doing so, the Court has heeded the rationale of the various circuit courts' recent decisions. While the Court questions the propriety of some of the language and proposals in those decisions, it recognizes that Congress or the United States Supreme Court, not this Court, must clarify when class actions are appropriate. Despite the various difficulties pointed out by the circuit courts, this Court, along with many other district courts, still believe that in most instances class actions are a superior method of dealing with large, complex mass tort litigation. *See, e.g.,* Jack B. Weinstein,

*Individual Justice in Mass Tort Litigation* (1995); *In re Copley Pharmaceutical, Inc.,* 158 F.R.D. 485 (D.Wyo.1994) (Brimmer, J.), *cited with approval in American Medical Systems,* 75 F.3d at 1089 n. 25.

In this order, the Court first discusses the facts of this case; in Section I, the Court reviews the various new circuit court decisions decertifying class actions; Section II explains that the proposed class in this case does not meet some of the requirements of Rule 23(a) and (b); and Section III is the Court's conclusion. This order, by no means, closes the door to class actions in products liability cases in general or in this case specifically. The Plaintiffs in this case, however, have failed to demonstrate to the Court that they have satisfied all the prerequisites of Federal Rule of Civil Procedure 23.

## BACKGROUND

The Plaintiffs originally sought to certify the following class:

> [a]ll persons worldwide who have had Accufix atrial 'J' pacemaker leads, Model 330–801, Model 329–701 and Model 088–812 placed in their bodies, and spouses of such persons.

Master Complaint, Document 37, ¶ 31. The Court originally granted the Plaintiffs' motion in part and certified the Plaintiffs' class for the common issues of negligence, strict liability, fraud, misrepresentation and breach of warranty. The Court did not certify the loss of consortium or emotional distress claims. Document 102. The Court also denied the Plaintiffs' request to certify the class for causation or damages. The Defendants then moved for reconsideration. On reconsideration, the Court decertified the foreign class. Document 137. The Court, however, affirmed its order certifying a United States' class, including a medical monitoring class.

### The "J" Stiffener Wire

The heart pacing system at issue consists of three main parts: a pulse generator, leads, and a programmer. Each pacing system usually contains one or two leads, which traverse through a person's veins, directly from the pulse generator to inside the heart. The

lead utilizes a retention wire to hold the atrial lead in the "J" shape. The lead's retention wire is a filament of one of two metal alloys, Elgiloy or MP35N. Telectronics Pacing Systems, Incorporated, Letter of Duane A. Schultz, Vice President Clinical and Regulatory Affairs, Premarket Notification to FDA, December 18, 1989. Both Elgiloy and MP35N are nickel-cobalt based alloys. *Id.*

The retention wire is not electrically active in the pacing circuit. Consequently, it has nothing to do with the conduction of the electrical signal or the operation of the pacing system.

The retention wire is encased in polyurethane insulation and bends back and forth within the system. The bending has caused the retention wire to break in some instances and poke through the polyurethane. Such a fracture can cause serious injury to the heart or blood vessels.

Defendant TPLC Pacing Systems, Inc. and TPLC, Inc. (collectively "TPLC")[1] manufactured the "J" lead at issue in this case, although other companies may have supplied them with the component parts including the retention wire. TPLC distributed over 40,-000 "J" leads[2] worldwide between 1988 and 1994. TPLC distributed Models 329–701 and 330–801[3] in the United States and Model 033–812 outside of the United States. TPLC admits that approximately 25,000 Accufix atrial "J" leads were implanted in the United States. Master Answer, Document 54, ¶ 52, at *18.

The Plaintiffs claim that all the "J" leads in the three models are essentially the same. While the models may differ in some minor details, the Plaintiffs claim that they are defective because of the same faulty design: a "J" stiffener wire that fractures as a result of metal fatigue. The Defendants argue that pacemakers are inherently dangerous devices, and that various reasons exist why the retention wire could fracture, including the procedures the physicians used to install the device.

**The History**

On October 21, 1994, TPLC notified the Food and Drug Administration ("FDA") that it was recalling all unsold leads. Telectronic Pacing Systems' President James W. Dennis then sent a letter on November 3, 1994, notifying all doctors that TPLC was voluntarily recalling all un-implanted Accufix atrial "J" pacemaker leads, models 330–801 and 329–701. TPLC issued these letters after receiving seven reports of fracture of the "J" shaped retention wire. TPLC has now received notice of at least eighteen fractures, including two which caused deaths. Additionally, four people have died from having the lead extracted.

On December 19, 1994, the Plaintiffs claim the FDA notified TPLC that it classified the recall as a Class I Recall. The FDA issues such notices when it finds that "a reasonable probability that a device intended for human use would cause serious, adverse health consequences or death." 21 U.S.C. § 360h(e)(1).

TPLC also initiated the Accufix Atrial "J" lead Multi–Center Study. The study evaluates the prevalence of retention wire fracture at ten international medical centers and uses x-ray techniques to detect fractured wires. In the Multi–Center Study, 1,165 people underwent fluoroscopy and the prevalence of J wire fractures within this Multi–Center Study population was 16.0%. Master Answer to the Amended and Consolidated Class Action Complaint, Document 121, ¶ 71 at *21 (citing "Dear Doctor" letter of April 27, 1995). Most recently, the Multi–Center study estimated that the prevalence of fracture, detected and undetected, is about 24.5%. Multi–Center Study Estimate, July

---

1. Telectronics Pacing Systems, Incorporated's sole business is to hold certain industrial property rights, real estate and equity in TPLC, Inc. TPLC actually manufactures the pacemakers and pacemaker leads.

2. While we refer to the device as a "J" lead, it is important to note that this litigation specifically focuses upon the retention wire that fractures.

3. The '701's lead retention wire only contains Elgiloy, whereas during production of the '801 the company switched to MP35N. Therefore, some of the '801's contain Elgiloy and others contain MP35N. The two are virtually identical for all relevant purposes.

31, 1995, TPC000045539. In light of these problems, TPLC created a physician advisory committee to assist it with patient management issues.

### The Proposed Class Representatives

The Plaintiffs have four people who are seeking to represent the class.

### 1. Mr. Q.T. Edwards

Mr. Q.T. Edwards is a forty-eight year old Ohio resident, who was implanted with a pacemaker system that included a "J" lead on October 10, 1991. In June 1995, Mr. Edwards had his lead explanted because it failed to conduct the electrical impulses necessary for the proper functioning of his pacemaker. Mr. Edwards had the lead explanted after his doctor warned him of the possibility of the stiffener wire fracturing. TPLC paid the expenses for having the lead extracted.

### 2. Mr. Eugene Homer Owens

Mr. Eugene Owens is a seventy-two year old Ohio resident, who had the pacemaker system, including the "J" lead, implanted on June 24, 1992. Mr. Owens' lead has functioned without failure and has not caused him any physical injury. Once he learned of the possibility of fracture, however, he has had "many sleepless nights worrying about [his] defective pacemaker." Eugene Owens' Answer to Interrogatory 8. Mr. Owens still has the pacemaker system.

### 3. Mr. Harold S. Bechert

Mr. Harold Bechert is an eighty-two year old Ohio resident, who had the pacemaker system, including the "J" lead, implanted on November 12, 1992. Mr. Bechert's lead has functioned without failure, fracture or complication. Mr. Bechert learned of the possibility of a retention wire fracture from the Defendants, and although his lead has not fractured, he fears that it may fracture in the future.

### 4. Mr. Lawrence Cheyne

Mr. Lawrence Cheyne is a seventy-six year old Oregon resident, who had the pacemaker system, including the "J" lead, implanted on March 11, 1993. After finding a possible retention wire fracture, Mr. Cheyne's lead was explanted on June 19, 1995. The doctors successfully removed the lead except for a small portion of the tip, which broke off and remains lodged in scar tissue in his heart. Apparently, the remaining piece has not caused Mr. Cheyne any problems to date.

## DISCUSSION

### I.

In the past few months, four circuit courts have been faced with class actions based upon penile implants, asbestos, nicotine, and HIV contaminated blood solids. For different reasons, all four circuit courts have decertified the classes in those cases.

### A. American Medical Systems—Penile Implants

In the decision having the most bearing on this case, the United States Court of Appeals for the Sixth Circuit decertified a class of penile implant recipients. *In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir.1996). The Sixth Circuit found that the trial judge's disregard for class action procedures warranted the Sixth Circuit's mandamus order decertifying the class. *Id.* at 1074.

In its decision, the Sixth Circuit discussed each of the Rule 23 prerequisites to certify a class. First, the Sixth Circuit reviewed Rule 23(a)(1)'s numerosity factor and found the trial judge "merely rubber stamped" the plaintiffs' assertions that the class was numerous. *Id.* at 1079. Such a rubber stamp, however, was permissible because the Defendants did not object. *Id.* at 1079–80.

Next, the Sixth Circuit reviewed whether the trial judge's determination that common questions of law and fact existed was correct. *Id.* at 1080 (citing Fed.R.Civ.P. 23(a)(2)). The Sixth Circuit found that ten different models of penile implants were implanted over twenty-two years, and the plaintiffs' claims differed depending upon the type of penile implant model. *Id.* Furthermore, a variety of factors could have caused the plaintiffs' injuries besides the penile product

itself. *Id.* Each plaintiff required individual testimony regarding reliance, causation and damages. *Id.* Consequently, the court held that "[i]n the absence of more specific allegations and/or proof of commonality of any factual or legal claims, plaintiffs have failed to meet their burden of proof on Rule 23(a)(2)." *Id.* The court concluded that the trial judge failed to consider seriously this issue. *Id.* The court further noted that the Judicial Panel on Multidistrict Litigation ("JPML") denied consolidation of all federal AMS penile prostheses cases. *Id.*

Third, the court considered whether the plaintiffs' claims were typical of the claims of the class. *Id.* at 1082 (citing Fed.R.Civ.P. 23(a)(3)). A representative's claim is typical if his interest is aligned with those of the represented group and advances the interests of the class members. *Id.* (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 3.13, at 3–75 (3d ed. 1992)). In *American Medical Systems*, all four named plaintiffs used different penile implant models and had different problems with their penile implant. *Id.* (One plaintiff had a leak in the input tube, one plaintiff's penile prosthesis failed to fully inflate, another's pump leaked, and the final plaintiff's penile prosthesis inflated on one side only.). The district judge failed to probe sufficiently behind the pleadings and gave no serious consideration to the typicality factor, "but [instead] simply mimicked the language of the rule." *Id.*

The court found a similar problem when it analyzed whether the class representatives would adequately represent the class. *Id.* at 1083 (citing Fed.R.Civ.P. 23(a)(4)). The court held that where the representative plaintiffs had unique claims, they would not vigorously protect members of the class who had different claims. *Id.*

Consequently, the court found that a class action would not be a superior way to litigate the penile prosthesis matter. *Id.* at 1084–85. "A single litigation addressing every complication in every model of prosthesis, including changes in design, manufacturing, and repre-

sentation over twenty-two years, as well as the unique problems of each plaintiff, would present a nearly insurmountable burden on the district court." *Id.* at 1085. Individual penile prosthesis cases, however, would be relatively simple to litigate once they were narrowly focused. *Id.* Once again, the Court of Appeals noted the district judge's failure to consider the JPML's decision not to consolidate these cases. *Id.* The district judge further failed to consider how the law of negligence differs.from jurisdiction to jurisdiction. *Id.*

Moreover, the district judge improperly placed the burden of proof on the defendants to show why he should not certify a class. *Id.* at 1086. The Court of Appeals therefore concluded that "the district judge's numerous errors in this case display an utter disregard for the judicial process." *Id.* at 1088.[4]

## B. Matter of Rhone–Poulenc Rorer—HIV Contaminated Blood Solids

In *Matter of Rhone–Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir.1995), the United States Court of Appeals for the Seventh Circuit decertified a class of hemophiliacs who used the drug antihemophilic factor concentrate ("AHF"). The plaintiffs became infected with the Human Immunodeficiency Virus (HIV) after using the defendants' drug, AHF. Chief Judge Posner, speaking for a divided court, found that mandamus and decertification were appropriate because the district judge had exceeded his discretion. *Id.* at 1299.

The Seventh Circuit raised three concerns with the class the district judge certified. First, the Seventh Circuit believed that a class action would force the defendants to settle because a jury of six persons would "hold the fate of an industry in the palm of its hand." *Id.* at 1299. Second, the Seventh Circuit found that the district judge proposed to have "the jury determine the negligence of the defendants under a legal standard that does not actually exist anywhere in the world." *Id.* at 1300. Third, the Seventh Circuit was concerned that the district court

---

**4.** Throughout this order, we quote and cite the *American Medical Systems* decision, because it is the authority we must follow. Our quotation of

that decision, however, should not be read to condone the mean-spiritedness the panel used to attack our deceased colleague.

improperly bifurcated certain issues. The Seventh Circuit reasoned that the issues of proximate cause and comparative negligence are inseparable from the defendants' negligence. *Id.* at 1303. Therefore, the district judge's plan was "inconsistent with the principle that the findings of one jury are not to be reexamined by a second, or third or nth jury." *Id.* The Seventh Circuit concluded that better alternatives existed to class actions than "entrusting the fate of an industry to a single jury." *Id.* at 1304.

Judge Illana Rovener wrote an eloquent and vigorous dissent, most of which questioned Judge Posner's improper use of a writ of mandamus. *Id.* at 1305. Judge Rovener found that Judge Posner's concern about submitting issues to a single jury "is a rationale for amending the rule, not for avoiding its application in a specific case." *Id.* at 1308.

As we stated in a previous order, this Court finds Judge Rovener's dissent both compelling and correct. *See* Document 102, at *16 n. 6. While Judge Posner's economic theories and distrust of juries may carry weight in the Seventh Circuit, we are still bound by the Federal Rules of Civil Procedure as the Sixth Circuit made clear in *American Medical Systems.* It causes this Court pause that one of this nations' most respected jurists has lost faith in the very system in which he participates. Furthermore, in this case a single jury may determine the fate of a single company, but surely will never hold an entire industry in its hands. Judge Posner's other two concerns regarding differing tort law and bifurcating issues merit more discussion, and thus, we will address them below.

## C. Georgine—Asbestos

In *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d Cir.1996), the United States Court of Appeals for the Third Circuit vacated a complex settlement reached by the parties in the district court and decertified the class. The Third Circuit stated that the case was so much larger and complex than "all other class actions on record that it cannot conceivably satisfy Rule 23." *Id.* at 618.

After a year of discussions, the parties in *Georgine* finally agreed upon a settlement, and the district court concluded that the settlement was fair and that class certification was appropriate. *Id.* at 620–22. "Objectors" to the settlement appealed. The Third Circuit held that the district judge improperly found that Rule 23 requirements are lower for settlement classes. *Id.* at 626. While class actions may be certified for settlement purposes, "Rule 23(a)'s requirements must be satisfied as if the case were going to be litigated." *Id.* at 624.

In this instance, the Third Circuit found that the class failed to satisfy the Rule 23 factors. *Id.* at 626. First, the class members did not satisfy the commonality requirement of Rule 23(a)(2) and 23(b)(3), because their claims varied widely. *Id.* "Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods." *Id.* Moreover, some plaintiffs suffered from life threatening diseases, while others did not experience any physical injury resulting from the asbestos exposure. *Id.* These "futures plaintiffs" shared little in common with the class members who had already been injured. *Id.* "In short, the number of uncommon issues in this humongous class action, with perhaps as many as a million class members, is colossal." *Id.* at 627.

Secondly, the Third Circuit held that the class also failed to meet the predominance test of Rule 23(b)(3). *Id.* The asbestos litigation lacks a single identifiable issue that could be tried in a class action. *Id.* at 628. The plaintiffs' various levels of exposure, different diseases and disparate lifestyles militated against a finding of commonality of issues. *Id.* at 628–29.

Next, the Third Circuit distinguished cases involving only partial certification of common issues and mass tort cases where common issues were tried and individual issues were left for trials of small groups of plaintiffs. *Id.* at 629 (citing *Central Wesleyan College v. W.R. Grace & Co.,* 6 F.3d 177, 184 (4th Cir.1995); *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468 (5th Cir.), *reh'g denied,* 785 F.2d 1034 (5th Cir.1986); *Sterling v. Velsicol*

*Chem. Corp.*, 855 F.2d 1188 (6th Cir.1988)). The court found that those cases did not "seek to resolve anywhere near the number of individual issues presented in this case." *Id.* Therefore, individual issues predominated over any common issues that may exist in asbestos litigation. *Id.* at 630.

Third, the Third Circuit recognized that the class could not have adequate representation pursuant to Rule 23(a)(4), when the class was rife with serious intra-class conflicts. *Id.* at 630. The settlement itself favored some claimants over others. *Id.* In fact, the settlement provided that many kinds of claimants would receive no monetary reward at all and made no provision for medical monitoring. *Id.* Moreover, the most salient conflict existed between those presently injured and "futures plaintiffs." *Id.* Obviously, "futures plaintiffs" would want to reduce current payouts, while those currently injured would want to maximize current payouts. Furthermore, the "futures plaintiffs" could not forecast what their futures would hold, and thus, probably would want a delayed opt-out procedure "like the one employed in *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 150 (S.D.Ohio 1992) (heart valve settlement allows claimants who ultimately experience heart valve fracture to reject guaranteed compensation and sue for damages at that time)." *Id.* at 631. Such a delayed opt-out would be of little relevance to the currently injured plaintiffs. *Id.* In light of all these conflicts (among others), the Third Circuit found that the class representatives could not adequately represent the interests of the entire class. *Id.* Without structural protections to safeguard varying interests, class certification is inappropriate. *Id.* These problems further led the Third Circuit to hold that the class also failed the typicality requirement of Rule 23(a)(3). *Id.* at 631–32. Finally, the Third Circuit found that in this instance a class action was not a superior method of adjudication, when compared with other methods of adjudication. *Id.* at 632–34.

## D. Castano—Nicotine–Dependent Persons

In *Castano v. American Tobacco Company*, 84 F.3d 734 (5th Cir. May 23, 1996), the United States Court of Appeals for the Fifth Circuit decertified a large and amorphous class in one of the most watched class actions ever. The district court originally granted class certification pursuant to Rule 23(b)(3) of all nicotine dependent persons in the United States ("the nicotine class"), and organized the class trial into the following four phases: (1) core liability; (2) injury-in-fact, proximate cause, reliance and affirmative defenses; (3) compensatory damages; and (4) punitive damages. *Castano v. American Tobacco Co.*, 160 F.R.D. 544, 553–58 (E.D.La. 1995). The plaintiffs limited the claims to the years since 1943. The Fifth Circuit expressed concern that "certification of an immature tort [injury-as-addiction claim] brings with it unique problems that may consume more judicial resources than certification will save." *Id.* at 749. The Fifth Circuit was very troubled about trying this cutting edge issue for the first time in a class action. *Id.*

Upon review, the Fifth Circuit found that the district court erred in two ways when it certified the class. *Castano, supra,* 84 F.3d at 740. "First, it failed to consider how variations in state law affect predominance and superiority." *Id.* A district court must consider variations in state law when a class action involves multiple jurisdictions, prior to making the predominance inquiry of Rule 23(b)(3). *Id.* at 741–42. In *Castano,* the district court conducted only a cursory review of variations in state law prior to certifying the class. *Id.* at 742–43. Such a review was insufficient to warrant class certification. *Id.* at 743–44.

Second, the district court's predominance inquiry did not consider how a trial on the merits would be conducted. *Id.* A court must go beyond the pleadings and determine exactly how individual trials would function, before it can properly determine whether "common issues" would be a significant portion of individual trials. *Id.* at 744–46. Here, the district court just assumed that common issues would be a significant portion of individual trials without conducting the requisite inquiry. *Id.* Such limited analysis was an abuse of discretion. *Id.*

The Fifth Circuit further pointed out that the nicotine class failed the superiority re-

quirement of Rule 23(b)(3). *Id.* The Fifth Circuit found that "a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority requirements required by Rule 23." [5] *Id.* at 746–48. Such trials are imperative, especially where novel claims based upon a new theory of liability exist. *Id.*

Moreover, "[t]he most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case." *Id.* at 748–49. The Fifth Circuit, influenced by Judge Posner, was wary of putting the fate of an entire industry in one jury's hands. *Id.* The Fifth Circuit, however, did not attempt to rewrite Rule 23, nor did it rule out a class action in this case; instead, it only found that individual trials would aid in the complicated predominance and superiority analysis. *Id.* [6]

Additionally, any savings in judicial resources were speculative at best at this point in the litigation. *Id.* at 749. "Only after courts have more experience with this type of case can a court certify issues in a way that preserves judicial resources." *Id.* In this case, the district court attempted to divide the core liability from the other issues such as comparative negligence and reliance. The district court, however, had no basis to assume that the core issues would not be considered again in the follow-up trials. *Id.* For example, if comparative negligence were raised at the individual trials, then evidence from the class trial would have to be repeated. *Id.* Consequently, "the net result may be a waste, not a savings, in judicial resources." *Id.*

Finally, the district judge failed to determine whether variations in state law defeat predominance. *Id.* at 750. Although difficult, this task is necessary in order for the district court to determine whether class cer-

tification is appropriate. *Id.* The Fifth Circuit concluded the district court abused its discretion by "ignoring variations in state law and how a trial on the alleged causes of action would be tried." *Id.* at 752.

## II.

It is against the backdrop of these cases that district courts must now undergo the laborious task of determining if class certification is appropriate. In doing so, we must consider the strictures of Rule 23's prerequisites and perform a rigorous analysis of the facts behind the case.

### A. Rule 23(a) Elements

Under Rule 23(a) there are four prerequisites to maintaining a class action: numerosity, commonality, typicality and adequacy of representation. The party seeking class certification bears the burden of proving that each of these factors have been met. *American Medical Systems,* 75 F.3d at 1079 (citations omitted). "Once those conditions are satisfied, the party seeking certification must also demonstrate that it falls within at least *one* of the subcategories of Rule 23(b)." *Id.* (emphasis in original).

### 1. Numerosity

Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). No strict numerical test exists to determine when a class is so numerous that joinder is impracticable. *American Medical Systems,* 75 F.3d at 1079. "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *Id.* (citation omitted).

In the case at bar, both parties are in agreement that about 25,000 people have had

**5.** The Honorable Chief Judge Richard A. Schell has heeded the Fifth Circuit's advice. *See In re NORPLANT Contraceptive Prods. Liability Litigation,* 878 F.Supp. 972, 974 (E.D.Tex.1995) ("This court intends ... to proceed with a limited number of individual trials in MDL 1038 in order to familiarize itself and the parties with the contours of this litigation.").

**6.** The Fifth Circuit did not base this new "individual trial requirement" on any rule, nor did it hold that the rules mandate such a procedure. Instead, the Fifth Circuit found that individual trials would aid district courts in "draw[ing] the information necessary to make the predominance and superiority requirements required by Rule 23." *Id.* at 747.

a pacemaker containing a "J" lead implanted in the United States. Master Answer, Document 54, ¶ 52, at *18 ("TPLC admits that as of July 1, 1995, there were 25,369 registered U.S. patients....") Significantly, TPLC does not contest that the Plaintiffs are so numerous that joinder is impracticable. Accordingly, the Plaintiffs have sufficiently met the numerosity factor.

### 2. Commonality

■ Rule 23(a)(2) requires the putative class to show that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). "The commonality test 'is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class.'" *American Medical Systems*, 75 F.3d at 1080 (citing 1 Newberg, *supra*, § 3–10 at 3–50 and *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.")).

■ In *American Medical Systems*, the plaintiffs simply alleged in "general terms that there are common issues without identifying any particular defect common to all plaintiffs." 75 F.3d at 1081. Unlike *American Medical Systems*, where there was uncontradicted evidence of ten **different** penile prosthesis models, here, only two models are at issue. Moreover, in a letter to the Food and Drug Administration, TPLC admitted that the two models ("J" lead model numbers 329–701 and 330–801) are virtually identical. November 1, 1988, Letter of Duane A. Shultz, Vice President, Product Quality, TPLC–Cordis, Inc. ("The VS–1 bipolar leads are similar to our existing Bipolar leads except for the proximal ends which have been modified to provide for interchangeability between leads and pulse generators from different manufacturers in compliance with Voluntary Standard (VS–1)"). In fact, the manufacturer's package insert for the two leads provides the same description: 48 centimeters in length; atrial lead type, polyurethane lead insulation; and a 3.2 millimeter connector size. The physicians manual describes both leads as a bipolar atrial "J" active fixation lead with a platinum-iridium porous surfaced electrode, a quadrifilar cobalt-nickel conductor and a platinum-iridium active fixation helix.

TPLC's internal memoranda indicate that the cause of failure in both the '701 and '801 model is the same—"metal fatigue." Telectronic Pacing Systems' Memorandum from Larry Wettlaufer and Mark Christensen, November 1, 1994, at ¶ 6. Unlike *American Medical Systems*, the Plaintiffs submitted affidavits of experts, which supported TPLC's conclusion that the "J" stiffener wire fracture is caused by metal fatigue. *See American Medical Systems*, 75 F.3d at 1081 ("AMS introduced uncontradicted evidence that since 1973 AMS has produced at least ten different models, and that these models have been modified over the years.").

The Plaintiffs allege that TPLC's conduct caused the metal fatigue; whereas, TPLC argues that several causes exist for the metal fatigue. The Plaintiffs have presented the Court with substantial evidence, including internal memoranda of TPLC, that TPLC's conduct could have caused the Plaintiffs' injuries. Ultimately, this is an issue the jury will have to decide: whether TPLC's conduct or some other reason caused the fatigue failure. This issue is common to all plaintiffs who have a pacemaker. Therefore, the Plaintiffs have satisfied their burden under Rule 23(a)(2).[7]

7. In *American Medical Systems*, the Sixth Circuit stated that the district judge should have further considered that the JPML denied consolidation of penile prosthesis because it found that "the degree of factual commonality among the actions in this litigation [does not] rise[] to a level that warrants section 1407 transfer." 75 F.3d at 1082 (quoting *In re Penile Implants Prod. Liab. Litig.*, MDL No. 1020 (J.P.M.L. Sept. 30, 1994)). In contrast, on June 2, 1995, the JPML decided to consolidate this case and stated "the Panel finds that the actions in this litigation involve common questions of fact, and that centralization under [28 U.S.C.] section 1407 in the Southern District of Ohio will best serve the interests of the parties...." *In re Telectronics Pacing Systems, Inc.*, MDL No. 1057 (J.P.M.L. June 2, 1995).

### 3. Typicality

■ Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."

> A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.... The typicality requirement may be satisfied even if there are factual distinctions between the named plaintiffs and those of other class members.

*De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (citations omitted); *see also Senter v. General Motors Corp.,* 532 F.2d 511, 525 n. 31 (6th Cir.1976) ("[t]o be typical, a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law."). While a representative's claims need not mimic the claims of every class member, the named plaintiff must advance the interests of the class members. *American Medical Systems,* 75 F.3d at 1082; *Georgine,* 83 F.3d at 631. The Plaintiffs bear the burden of establishing that the representatives' claims are typical of the class. *American Medical Systems,* 75 F.3d at 1082.

At this time, the Plaintiffs have failed to sustain this burden. Currently, the Plaintiffs have four remaining class representatives: Mr. Edwards, Mr. Owens, Mr. Bechert and Mr. Cheyne.[8] The Court cannot assume that these plaintiffs' claims are typical of the class, but must "probe behind the pleadings" to determine if the typicality requirement is met. *Id.* (citing *General Tele. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982)). The Plaintiffs have provided the Court with very little evidence that the representatives' claims are typical of the class.

#### a. Mr. Bechert and Mr. Owens

■ First, it is questionable whether Messrs. Bechert and Owens have suffered an injury so as to sustain a viable cause of action. It is debatable whether Messrs. Bechert and Owens can meet this burden because their pacemakers are currently functioning without failure, fraction or complication. The Plaintiffs carry the burden of showing that the class representatives have a viable cause of action.

In fact, TPLC has moved to dismiss Plaintiffs Bechert and Owens and all other Ohio Plaintiffs whose leads have not fractured. Defendants' Reply Memorandum in Support of Motion to Dismiss, Document 114, at *2.[9] The Plaintiffs filed a sur-reply to the Defendants' motion to dismiss in which they stated "Defendants' 12(b)(6) Motion does not challenge the specific facts supporting the claims of each Ohio Plaintiff. Defendants' Motion challenges *only* the facts supporting the claims of the Bechert and Owens Plaintiffs.... [t]he Motion fails to even address, let alone challenge, the specific facts supporting the claims of each of these additional Ohio Plaintiffs." Plaintiffs' Sur–Reply, Document 149, Exhibit A at 3–4 (emphasis in original). Therefore, the Plaintiffs have taken positions which are fundamentally inconsistent. While the typicality requirement can be met where factual distinctions exist between the class representatives and class members, such distinctions cannot exist on the fundamental claims that the Plaintiffs seek to certify. *See Falcon, supra,* 457 U.S. at 157, 102 S.Ct. at 2370 (stating that both the commonality and typicality requirements ensure that the "plaintiff's claim and the class' claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"). Otherwise, a class action would be very lopsided. The Plaintiffs would be entitled to a verdict for the whole class, but the Defendants would have to fight against each indi-

---

8. The Court refused to certify loss of consortium, and thus, Mrs. Owens, Mrs. Bechert and Mrs. Cheyne are no longer valid class representatives. Document 102, at *19 n. 10. Furthermore, the Court decertified the foreign class members including one of the class representatives, Ms. Warren.

9. In discussing this motion, the Court does not intend to decide TPLC's motion to dismiss. The Court will decide this motion in a separate order. Additionally, since we are decertifying the class, the motion will obviously only apply to Plaintiffs Bechert and Owens.

vidual Plaintiff. In this case, the Plaintiffs are attempting to use class certification as both a sword and a shield. If Plaintiffs Bechert and Owens are to represent all Plaintiffs whose leads have not fractured, the Plaintiffs must accept the good with the bad on the common claims.

Assuming that this Court decides the Defendants' motion to dismiss in favor of Bechert and Owens,[10] the Plaintiffs still must establish that Bechert and Owens are typical of all Plaintiffs nationwide in order to have a certifiable class. Bechert and Owens are both Ohio residents, and therefore, their claims may be representative of all Plaintiffs in Ohio, whose leads are functioning without failure. In order for Bechert and Owens to show that they could represent all Plaintiffs nationwide, the Plaintiffs must show that all jurisdictions, not just Ohio, recognize viable causes of action for persons who have not suffered a physical injury. *American Medical Systems*, 75 F.3d at 1085. The Plaintiffs have failed to even brave this large endeavor.

All states do not agree on some of the issues presented here, and therefore, subclasses with proper representatives must be formed. For example, a plaintiff has a cause of action for medical monitoring and does not have to prove a present, physical injury in Colorado, the District of Columbia, Kansas, Kentucky, New York, Pennsylvania, Utah, Washington and Guam.[11] *See Cook v. Rockwell Intern. Corp.*, 755 F.Supp. 1468, 1477 (D.Colo.1991) (district court concluding that Colorado Supreme Court would recognize a tort claim for medical monitoring);[12] *Friends For All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 824–25 (D.C.Cir.1984) (holding District of Columbia recognizes a cause of action for medical monitoring without manifestation of physical inju-

ry); *Burton v. R.J. Reynolds Tobacco Co.*, 884 F.Supp. 1515, 1523 n. 6 (D.Kan.1995) (stating that a claim is recognized in Kansas only if the plaintiff has not yet suffered injuries; otherwise, medical monitoring is merely a component of damages); *Bocook v. Ashland Oil, Inc.*, 819 F.Supp. 530, 536–37 (S.D.W.Va.1993) (applying Kentucky law and finding that a plaintiff who could present evidence of need for medical monitoring did not need to prove "a demonstrable physical injury"); *Gibbs v. E.I. DuPont De Nemours & Co., Inc.*, 876 F.Supp. 475, 479 (W.D.N.Y. 1995) (holding that New York recognizes "a claim for medical monitoring in the absence of a physical injury"); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 786–87 (3d Cir.1994) (Pennsylvania) (setting out a four step test for when medical monitoring is appropriate and finding that physical injury is not necessary), *cert. denied*, —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 979 (Utah 1993) (holding medical monitoring available to those who have ingested, inhaled, injected or otherwise absorbed a toxic substance that results in an increased risk of serious injury and medical testing will provide a substantial benefit); *In re Hanford Nuclear Reserv. Litig.*, 780 F.Supp. 1551, 1562 (E.D.Wash.1991) (holding Washington takes same view as Pennsylvania regarding medical surveillance, see *Paoli supra*); *Abuan v. General Elec. Co.*, 3 F.3d 329, 334 (9th Cir.1993) (adopting *Paoli* test, *supra*, for Guam), *cert. denied*, 510 U.S. 1116, 114 S.Ct. 1064, 127 L.Ed.2d 383 (1992).

Although California does not require a plaintiff to show a present, physical injury to recover medical monitoring costs, California only recognizes medical monitoring as a com-

---

**10.** The Defendants also must take the good with the bad. In decertifying the class, we can now only decide individual motions in individual cases. If we find that Bechert and Owens do not have a valid cause of action, each individual Plaintiff would have the opportunity to distinguish their case, as the Plaintiffs point out in their sur-reply.

**11.** The Court would like to recognize The Honorable Chief Judge Richard A. Schell of the Eastern District of Texas, his law clerk Brady Edwards, and their entire chambers for their assistance in

the unenviable task of compiling the state law cited throughout this order. Without their able assistance, this Court's task would have been much more difficult.

**12.** Almost all of these cases involve a toxic substance, such as asbestos. In this case, the plaintiffs are making a products liability claim and not a toxic substance exposure claim. Therefore, the Plaintiffs bear the burden of showing that these cases should be extended to include product liability situations.

pensable item of damage when liability is established under traditional tort theories of recovery. *Potter v. Firestone Tire and Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 822–23 (1993) (in bank) (noting that exposure and reasonable need for medical monitoring are requisite elements for recovery of medical monitoring costs). The California Supreme Court held that the plaintiff must prove that the defendant negligently invaded her interest and that in order to make her whole the defendant must compensate her for her medical costs. *Id.* at 577, 863 P.2d at 824 ("It bears emphasizing that allowing compensation for medical monitoring costs 'does not require courts to speculate about the probability of future injury. It merely requires courts to ascertain the probability that the far less costly remedy of medical supervision is appropriate.' ... We are therefore persuaded that recovery of medical monitoring damages should not be dependent upon a showing that a particular cancer or disease is reasonably certain to occur in the future.") (quoting *Paoli*, 916 F.2d at 852).

Although a plaintiff need not prove a present, physical injury, medical monitoring is also an element of damages rather than an independent cause of action under Alabama, Arizona, Louisiana, Michigan, Minnesota, Missouri, New Jersey, Ohio and Vermont law. *See Cain v. Armstrong World Indus.*, 785 F.Supp. 1448, 1451–52 (S.D.Ala.1992) (discussing that plaintiffs are entitled to damages for necessary future medical monitoring); *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 377–80, 752 P.2d 28, 30–33 (Ct.App. 1987) (holding that threat of future harm is not enough to recover for emotional distress, but asbestos exposure justifies ordering the defendant to pay costs for medical monitoring and manifestation of injury is not necessary), *review dismissed*, 162 Ariz. 186, 781 P.2d 1373 (1989); *Johnson v. Armstrong Cork Co.*, 645 F.Supp. 764, 769 (W.D.La.1986) (holding that "medical expenses, past and future, which the plaintiffs incur to monitor the development of a possible cancerous condition is a recoverable element of damages."); *Meyerhoff v. Turner Construction Co.*, 210 Mich.App. 491, 534 N.W.2d 204, 206 (1995) (holding "that medical expenses are a com-

pensable item of damages where the proofs demonstrate that such surveillance to monitor the effect of exposure to toxic substance, such as asbestos, is reasonable and necessary"); *Werlein v. United States*, 746 F.Supp. 887, 904–05 (D.Minn.1990) (holding that a plaintiff can recover costs for future medical monitoring as tort damages if the plaintiff shows that her exposure to a toxic substance has caused an increased risk of incurring a disease and her doctor recommends medical monitoring), *vacated in part on other grounds*, 793 F.Supp. 898 (D.Minn. 1992); *Thomas v. FAG Bearings Corp., Inc.*, 846 F.Supp. 1400, 1404 (W.D.Mo.1994) (holding that costs for future medical expenses are an element of tort damages) and *Elam v. Alcolac*, 765 S.W.2d 42, 209 (Mo.Ct.App.1988) ("Compensation for necessary medical expenses reasonably anticipated in the future rests on well-accepted legal principle."), *cert. denied*, 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989); *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287, 311–13 (1987) (holding that medical surveillance is a compensable item of damages where proofs demonstrate the extent and significance of exposure to chemicals and the potential hazardous effect); *Day v. NLO*, 851 F.Supp. 869, 879–81 (S.D.Ohio 1994) (holding that where a plaintiff can show an increased risk of disease that would warrant a physician to order medical monitoring, they are entitled to medical monitoring as a part of damages); *Stead v. F.E. Myers Co., Div. of McNeil Corp.*, 785 F.Supp. 56, 57 (D.Vt.1990) (holding plaintiffs are entitled to medical monitoring as a form of damages, when they can prove an increased risk of disease as a result of exposure).

Finally, a plaintiff must show physical injury before they can state a viable claim for medical monitoring under Delaware, Virginia, West Virginia and Virgin Islands law. *Mergenthaler v. Asbestos Corp.*, 480 A.2d 647, 651 (Del.1984) (holding asbestos-exposure plaintiffs must show physical injury before the defendants must bear expenses for medical surveillance); *Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th Cir.1991) (holding that West Virginia and Virginia require that the plaintiffs demonstrate that

they are suffering from a present, physical injury before they are entitled to recover medical surveillance costs), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 876, 116 L.Ed.2d 780 (1992); *Purjet v. Hess Oil Virgin Islands Corp.,* 1986 WL 1200, at \*4 (D.V.I. Jan. 8, 1996) (holding that in the Virgin Islands actual injury is a prerequisite to a medical monitoring claim).

Therefore, in order for this Court to certify a class, the Plaintiffs must establish subclasses for most of the non-Ohio residents, who require different class representatives than Messrs. Bechert and Owens. *See American Medical Systems,* 75 F.3d at 1085 (plaintiffs bear burden to show each prerequisite of Rule 23 had been satisfied).[13] The Court cannot and will not perform its own discovery to search for different Plaintiffs for different sub-classes. This is especially important in light of the Sixth Circuit's admonition that in product liability cases the Plaintiffs must establish that their proposed class strictly adheres to Rule 23. *Id.* at 1089 ("This is not to say that a class action in such a context will never be appropriate, but it is to say that strict adherence to Rule 23 in products liability cases involving drug or medical products which require FDA approval is *especially* important.") (emphasis in original) (footnote omitted).

### b. Mr. Cheyne and Mr. Edwards

The other two class representatives in this action are Mr. Cheyne and Mr. Edwards. Mr. Cheyne resides in Oregon, and Mr. Edwards resides in Ohio.

Mr. Cheyne had his lead explanted after learning of the possibility of the "J" wire fracturing. The doctors successfully removed the lead except for a small portion of the tip, which broke off and remains lodged in scar tissue in his heart. Luckily, the remaining piece has not caused Mr. Cheyne any problems to date. While Mr. Cheyne may have many claims typical of other class members, for the reasons stated below in section 4, we find that he is not an adequate representative, and thus, we refrain from a

detailed typicality analysis regarding his claims.

■ Mr. Edwards experienced difficulty with his pacemaker when it failed to properly conduct electrical impulses. The doctor warned him about the possibility of the "J" wire fracturing, and he decided to have the lead explanted. TPLC paid all expenses.

In the Plaintiffs' brief regarding state tort laws, they concede that Ohio does not recognize negligence as a theory of recovery in a product liability case. *See* Plaintiffs' Survey of State Law, Document 184, Appendix 3, "State by State Analysis of Negligence," pg. 4 ("Negligence permitted as theory of recovery—no."); *see also* Ohio Rev.Code § 2307.73(A) ("A manufacturer is subject to liability for compensatory damages based on a product liability claim only if the claimant establishes [one of the statutory elements set forth in Ohio Rev.Code §§ 2307.74–77].");  *Carrel v. Allied Products Corp.,* 1995 WL 423388, at \*7 (Ohio Ct.App.) (unpublished) ("The statute's silence regarding common law product liability claims against manufacturers can only be construed as meaning that the legislature chose to eliminate a common law negligence claim against a manufacturer.... [a] common law cause of action for negligent design is no longer viable in Ohio."), *jurisdiction denied and appeal dismissed,* 74 Ohio St.3d 1475, 657 N.E.2d 783 (Ohio 1995). In contrast, Michigan recognizes negligence but does not recognize strict liability. *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 365 N.W.2d 176, 181–82 (1984); *see also Cline v. Prowler Indus., Inc.,* 418 A.2d 968, 980 (Del.1980) (en banc) (declining to adopt strict liability in cases involving the sale of goods); *Swartz v. General Motors Corp.,* 375 Mass. 628, 378 N.E.2d 61, 62 (1978) (holding no "strict liability in tort" in Massachusetts); *but see Back v. Wickes Corp.,* 375 Mass. 633, 378 N.E.2d 964, 968 (1978) (holding that warranty liability is "intended to be fully as comprehensive as the strict liability theory of recovery that has been adopted by a great

---

**13.** In *American Medical Systems,* the Sixth Circuit found that a district judge would face an impossible task of instructing a jury on the relevant law, if more than a few laws of the fifty states differ. To overcome this problem, this

Court, for example, would divide the Plaintiffs into subclasses, and then if it was as difficult as the Sixth Circuit foresaw, we could have separate trials for the main subclasses. At this stage, however, this is irrelevant.

many other jurisdictions."); *Smith v. Fiber Controls Corp.,* 300 N.C. 669, 268 S.E.2d 504, 510 (1980) (holding that North Carolina does not recognize strict liability in tort); *Sensenbrenner v. Rust, Orling & Neale Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 57 n. 4 (1988) (holding Virginia law "does not permit tort recovery on a strict liability theory in products liability cases"). Therefore, Edwards, an Ohio resident, does not have claims typical of class members who are residents of states that either recognize common law negligence or that do not recognize strict liability.[14]

### 4. Adequacy of Representation

■ Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). "This prerequisite is essential to due process, because a final judgment in a class action is *binding* on all class members." *American Medical Systems,* 75 F.3d at 1083 (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)) (other citations omitted) (emphasis added).

■ In *Senter,* the Sixth Circuit articulated two criteria district courts must use to determine the adequacy of the representation: "1) the representative must have common interests with the unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." 532 F.2d at 525 (citation omitted). Under these criteria, we find that all of the named representatives are insufficient class representatives.

■ First, the Ohio representatives have no incentive to pursue the plaintiffs' negligence claims, since, as discussed above, they do not have negligence claims themselves. *See American Medical Systems,* 75 F.3d at

1083 ("The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members.").

■ Second, on reconsideration, this Court questions whether the representative plaintiffs will "vigorously prosecute the interests of the class." *Id.* After reviewing *American Medical Systems,* this Court finds that a district court should conduct a detailed inquiry, including a hearing if necessary, to determine whether the named representatives will adequately represent the class. Even a cursory review in this case indicates that the representative plaintiffs may not be adequate. For example, at his deposition Mr. Cheyne did not even know that he was a class representative and has stated that his health will not allow him to travel outside the state of Oregon. Deposition of Lawrence Cheyne, August 4, 1995, at *91.[15] Therefore, the Court will not ratify Plaintiffs' counsel's attempt to appoint a class representative who is unable to travel and has no knowledge that he is a class representative. *See American Medical Systems,* 75 F.3d at 1083 (finding that plaintiff's history of psychological problems made him questionable class representative); *see also Roundtree v. Cincinnati Bell, Inc.,* 90 F.R.D. 7, 10 (S.D.Ohio 1979) (Plaintiff's history of physical ailments and corresponding neurosis "may affect plaintiff's ability to vigorously participate in the prosecution of class action.").

■ In order to be a class representative who will vigorously prosecute a class action, the representative must have more knowledge than a lay person about the class action. Here, Mr. Edwards is unsure why he agreed to act as a class representative, was never told what it meant to be a class representa-

---

**14.** Of course, some of Edwards' tort claims may be typical of these plaintiffs. The Plaintiffs, however, carry the burden of establishing subclasses with appropriate representatives. Obviously, Edwards is not typical of the plaintiffs in most jurisdictions, who will be trying to establish that TPLC acted negligently.

**15.** In this case, many Plaintiffs exist who are able to travel. If this were a case where the majority

of the class was so severely injured that none of them could travel, the Court would accept a class representative such as Mr. Cheyne. Plaintiffs' counsel, however, has given the Court no indication why Mr. Cheyne should be a class representative. Furthermore, the Court finds it troubling that he was never told that he was a class representative.

tive, and has not even found out how and if the alleged defective "J" lead affects anyone else. Deposition of Q.T. Edwards, July 26, 1995, at *90. Mr. Owens does not know what it means to be a part of a class action, but agreed to act as a class representative anyway. Deposition of Eugene Homer Owens, May 16, 1995, at *65–6. Therefore, Messrs. Edwards and Owens have failed to demonstrate the requisite knowledge to be a vigorous representative of the class.

■ On the other hand, Mr. Bechert's deposition demonstrated that he could be an adequate representative, if he could satisfy the typicality requirement and class counsel provided him with some instruction about being a class representative. Mr. Bechert understood his obligations and demonstrated that he had knowledge of the reasons for the lead failure. See Deposition of Harold S. Bechert, July 24, 1995, at *86 and *104. Mr. Bechert presumed that his representation would involve court appearances. *Id.* at *86. Mr. Bechert, however, has never had any conversations with his attorney about the nature of the problem in this case. *Id.* at 1404. Thus, class counsel should not have a difficult time transforming Mr. Bechert into an adequate representative. Mr. Bechert will be adequate after class counsel instructs him about what this action entails, and the amount of time he will have to commit in order to vigorously represent the class.[16]

## B. Rule 23(b)

Initially, this Court certified the class under Rule 23(b)(3).[17] Rule 23(b)(3) has two primary requirements: (1) that common issues predominate over individual issues, and (2) class treatment is superior to other methods of adjudication.

### 1. Common Issues versus Individual Issues

■ Rule 23(b)(3) parallels Rule 23(a)(2) in that both subdivisions require that common issues exist, but 23(b)(3)'s predominance test goes further by insuring that the common issues predominate over individual issues. *American Medical Systems,* 75 F.3d at 1084. The inquiry is mainly a pragmatic one: do the common issues justify a common adjudication? 7A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1778 (1986).

In the past, numerous courts have found that common issues predominate when a large number of lawsuits arise from a single disaster or single course of conduct. *See Sterling, supra,* 855 F.2d at 1197 (contamination of water—toxic tort class); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145 (2d Cir.1987) (class of service people exposed to the herbicide Agent Orange while in Vietnam); *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1023 (5th Cir.1992) (approving a class of about 18,000 plaintiffs injured in an oil refinery explosion), *reh'g granted,* 990 F.2d 805 (5th Cir.1993), *appeal dismissed,* 53 F.3d 663 (5th Cir.1994). "[W]here the defendant's liability can be determined on a class-wide basis because the cause of the disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy." *Sterling,* 855 F.2d at 1197. The *American Medical Systems* court, however, found that products liability actions differed from mass tort cases, because products liability cases usually involve factual and legal issues that vary dramatically from individual to individual. 75 F.3d at 1084. Nevertheless, the Sixth Circuit did not close the door on product liability class actions, but instead held that district courts must exercise great care before certifying such a class.

**16.** The Court does not doubt, nor do the Defendants contest, that Plaintiffs' counsel will vigorously prosecute this action.

**17.** We also held that the medical monitoring class was an equitable class, and thus, certified it pursuant to Rule 23(b)(2). We now recognize that several states have held that an injured plaintiff can recover damages for medical monitoring. See, *supra,* section II.(A)(3). Typically,

it is best to establish an action primarily for damages under Rule 23(b)(3). *In re Asbestos School Litigation,* 104 F.R.D. 422, 438 (E.D.Penn.1984). In this order, we are decertifying the class, and thus, decline to decide this issue. If the plaintiffs attempt to certify an equitable class at a later date, they will have to overcome this obstacle.

*Id.* at 1089 ("This is not to say that a class action in [medical product liability/personal injury cases] will never be appropriate, but it is to say that strict adherence to Rule 23 in products liability cases involving ... medical products which require FDA approval is *especially* important.") (emphasis in original) (footnote omitted) (citation omitted).

In *In re Copley Pharmaceutical, Inc.*, 158 F.R.D. 485 (D.Wyo.1994), the district court certified a class of all persons who suffered injury after using Albuterol, a bronchodilator prescription pharmaceutical manufactured by Copley Pharmaceutical. The court found that the common questions were more straight forward than most product liability cases, because there was "only one defendant, one product, with no marketshare issues or other complications that are present in most product liability actions." *Id.* at 489. Therefore, the court certified the threshold questions including: whether the defendant's manufacturing process was defective, whether the defendant was negligent in manufacture and distribution, and whether the defendant breached any warranties in selling its product. *Id.* All of those questions had to be answered in each plaintiff's case, and thus, class certification would efficiently resolve those issues. *Id.* Other courts have also utilized partial certification to resolve common issues. *See, e.g., Central Wesleyan College v. W.R. Grace & Co.* 6 F.3d 177, 184 (4th Cir.1993) (holding that district courts should "promote the use of the class device" to reduce the range of disputed issues and that certification of eight common questions was proper); *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471 (5th Cir.) (holding that district court properly certified common issues in mass tort (asbestos) action), *reh'g denied*, 785 F.2d 1034 (5th Cir.1986).

Courts have authority to grant certification for particular issues pursuant to Rule 23(c)(4)(A). Fed.R.Civ.P. 23(c)(4)(A) ("[A]n action may be brought or maintained as a class action with respect to particular issues."). Specifically, the advisory committee's note to Rule 23(c)(4)(A) provides:

> This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Fed.R.Civ.P. 23(c)(4)(A) advisory committee's note.

Previously, the Court utilized its authority under Rule 23(c)(4)(a) to certify a class for trial of common issues. The Plaintiffs have sufficiently demonstrated that common issues of fact predominate, and that this case is more analogous to *Copley* than *American Medical Systems.*[18] For example, in this case, the Plaintiffs have sufficiently demonstrated that the two models implanted, '701 and '801, are virtually identical. *Compare Copley*, 158 F.R.D. at 489 (one product); *American Medical Systems*, 75 F.3d at 1069 (ten different products). The Plaintiffs further demonstrated that individual trials would be heavily weighted with repetitive factual issues (i.e. whether TPLC was negligent in manufacturing the "J" lead), which could be resolved in one trial. *See Copley*, 158 F.R.D. at 491 (holding that while individual issues existed, the equally significant common issues merited class treatment); *American Medical Systems*, 75 F.3d at 1085 (holding that any economies of scale achieved by class treatment were offset by predominant individual issues). The issues focusing on the Defendants' liability can be resolved in one trial, and then the class members can pursue their individual cases in separate trials to determine if they suffered injury and the proper amount of damages. *See Copley*, 158 F.R.D. at 492 (establishing similar trial plan); *Sterling, supra*, 855 F.2d at 1200 (court first assessed defendant's potential liability for its conduct and left it to individual plaintiffs to show proximate cause and damages). Finally, the JPML found that consolidated treatment in this case would benefit all plaintiffs. While this is not determinative, it aids the Court in resolving whether certifica-

---

**18.** In *American Medical Systems*, the Sixth Circuit cited *Copley* as an instance where a district court properly certified a products liability class. *American Medical Systems*, 75 F.3d at 1089 n. 25.

tion of common issues is proper. *See Copley,* 158 F.R.D. at 492 (JPML consolidated all cases in an MDL); *American Medical Systems,* 75 F.3d at 1085 (district judge failed to consider import of JPML's decision not to consolidate). Consequently, we find that common issues do predominate in this case.

### 2. Superiority of a Class Action

■ The Plaintiffs must also demonstrate that this litigation would be superior to all other methods of litigation. Fed.R.Civ.P. 23(b)(3). "The rule asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine,* 83 F.3d at 632 (citation omitted). The Plaintiffs have failed to demonstrate that a class action will be superior to other methods of adjudication.

In order to demonstrate that a class action is superior to other forms of litigation, the Plaintiffs must show that such an action is manageable in light of state law variations. *Castano, supra,* 84 F.3d at 743–44.[19] The Plaintiffs simply assert that any nuances or differences in state law that do exist "can be handled by the creation of subclasses and separate jury interrogatories." Plaintiffs' Survey of State Law, Document 184 at *20. The Plaintiffs, however, bear the burden of establishing appropriate subclasses and demonstrating that each subclass meets the Rule 23 requirements. Fed.R.Civ.P. 23(c)(4) ("[A] class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."); *Manual for Complex Litigation (Third)* § 30.15 (1995) ("Each class or subclass must independently satisfy the prerequisites of Rules 23(a) and (b).")." The Plaintiffs cannot postpone this burden and expect this Court to certify an amorphous, undefined class. The Plaintiffs must come forward with the exact definition of each subclass, its representatives, and the reasons each subclass meets the prerequi-

sites of Rule 23(a) and (b). Furthermore, the variations in state law must guide the Plaintiffs' creation of subclasses.

The Court cannot even begin a superiority analysis absent some type of proposed structure in which the case will be tried. *See, e.g., Castano,* 84 F.3d at 743–44 ("In summary, whether the specter of millions of cases outweighs any manageability problems in this class is uncertain when the scope of any manageability problems is unknown."). Therefore, the Plaintiffs have not demonstrated that a class action would be superior to other methods of litigation.

### III.

### CONCLUSION

Accordingly, the Court DENIES the Plaintiffs' motion for reconsideration, GRANTS the Defendants' motion for reconsideration and ORDERS that the class be DECERTIFIED as presently formulated.

SO ORDERED.

---

**19.** Rule 23(b)(3) also provides the following four factors to consider when determining if the "predominance" and "superiority" tests have been satisfied: (a) the interest of individual members of the class in controlling their own cases; (b) the nature and extent to which prior litigation has been commenced by members of the class; (c) the desirability of concentrating all claims in one forum; and (d) the difficulties likely to be encountered in managing a class action. In this case, we find the fourth factor, manageability, the most pertinent and difficult to satisfy.