Laurence O'CONNOR, et al., Plaintiffs,

v.

BOEING NORTH AMERICAN, INC., et al., Defendants.

No. CV 97–1554 ABC (RCX).

United States District Court, C.D. California.

Oct. 20, 1997.

J. Paul Gignac, A. Barry Cappello, Cappello & McCann, Santa Barbara, CA, Tina B. Nieves, Hector Gancedo, Gancedo & Nieves, Pasadena, CA, for Plaintiffs.

William W. Schofield, Jr., John Anthony Reding, Barry Nathan Endick, Paul, Hastings, Janofsky & Walker, San Francisco, CA, for Boeing North American, Inc.

W. Toliver Besson, Paul, Hastings, Janofsky & Walker, Los Angeles, CA, William W. Schofield, Jr., John Anthony Reding, Barry Nathan Endick, Peter C. Meier, Paul, Hastings, Janofsky & Walker, San Francisco, CA, for Rockwell International Corp.

## ORDER RE: PLAINTIFFS LAURENCE O'CONNOR, ET. AL.'S MOTION FOR CLASS CERTIFICATION

COLLINS, District Judge.

Plaintiffs' motion for class certification came on regularly for hearing before this Court on October 20, 1997. After reviewing the materials submitted by the parties, argument of counsel, and the case file, it is hereby ORDERED that Plaintiffs' motion is DENIED.

### I. Background

#### A. Procedural Background

On March 10, 1997, Plaintiffs Laurence O'Connor, et al. ("Plaintiffs") filed a class action complaint on behalf of themselves and all others similarly situated against Defendants Boeing North American, Inc., et al. ("Defendants"). The case was transferred to this Court on April 7, 1997 as a related case to the following actions: *The Branders–Bardin Institute v. Rocketdyne, et. al.*, No. CV 95–831 ABC (RCx) ("BBI") and *Lavonne Klea v. United States of America, et. al.*, No. CV 96–5644 ABC (RCx) ("Klea"). Plaintiffs filed a First Amended Complaint ("FAC") on May 9, 1997. Subsequently, on June 27, 1997, Plaintiffs filed a Second Amended Complaint ("SAC") alleging the following causes of action: (1) violations of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9659; (2) public liability under the Price Anderson Act, 42 U.S.C. § 2210; (3) negligence; (4) negligence per se; (5) strict liability for ultrahazardous activities; (6) continuing trespass; (7) permanent trespass; (8) continuing private nuisance; (9) permanent private nuisance; and (10) declaratory relief.[1] Plaintiffs filed the instant motion for class certification ("Motion") on September 8, 1997. Defendant Boeing North American, Inc. ("BNA") filed opposing papers on September 22, 1997. Plaintiff filed a reply on October 6, 1997.

#### B. Factual Background

Plaintiffs bring this action on their own behalf and/or as representatives of the class or subclass they seek to certify based on

---

1. Defendant Boeing North American, Inc. filed an Answer to Plaintiffs' SAC on July 11, 1997.

alleged activities conducted by the Defendants at the Rocketdyne Division Santa Susana Field Laboratory in Simi Valley, the Atomics International facility in Canoga Park, the Atomics International facility in the San Fernando Valley, and the Hughes Aircraft facility in the San Fernando Valley ("the Rocketdyne Facilities"), which have resulted in alleged releases of "hazardous, radioactive, toxic and carcinogenic substances." SAC at ¶ 2. The class Plaintiffs purport to represent is defined as follows:

> all persons or entities who presently reside or work, or have at any time since 1946 resided or worked, in the geographic area bounded by the Santa Susana Mountains on the north, the 101 freeway on the south, the 23 freeway on the west, and the 405 freeway on the east. ("the Class").

*Id.* at ¶ 62.

Excluded from this definition are "Defendants, their parents, subsidiaries, divisions and affiliates, ... any present or former employees of Defendants to the extent their exposure to the hazardous substances released from the Rocketdyne Facilities occurred in or arose out of the course of their employment with Defendants." *Id.* However, Plaintiffs admit that the geographic scope of the Class ("Contamination Area"), may expand or contract after further analysis by real estate and/or environmental experts. *Id.* Plaintiffs also seek to certify a subclass defined as follows:

> all persons and entities within the Class who are owners of real property located in the Contamination Area and whose property has been affected in some manner by the release of hazardous substances into the environment from the Rocketdyne Facilities ("the Property Owner Subclass").

*Id.* at ¶ 64.

Each of the representative Plaintiffs reside or have resided within the Contamination Area, and/or own or have owned real property within the Area and/or have been diagnosed with some form of cancer. *Id.* at ¶¶ 8–13. Each of the Defendants owned or operated one or more of the Rocketdyne Facilities. *Id.* at ¶¶ 53–60.[2]

Plaintiffs allege that Defendants conducted nuclear testing between the 1950's and 1980's which resulted in "a number of releases and other 'accidents' and practices at the Rocketdyne Facilities [which] caused cesium, tritium and other radioactive elements to leak into the water and ground beneath the research site ." *Id.* at ¶ 79. Plaintiffs further allege that at least until July 26, 1994, Defendants have continued to release hazardous wastes around the Rocketdyne Facilities, which include radioactive and non-radioactive hazardous substance, resulting in contamination of ground and surface water. *Id.* at ¶¶ 81–82. Furthermore, Plaintiffs contend that numerous accidents have occurred at the Rocketdyne facilities allegedly causing "radiation to be released into the groundwater, soil and air and carried in large quantities to the surrounding neighborhoods and communities where Plaintiffs and class members reside." *Id.* at ¶ 84; *see also id.* at ¶ 83. In addition to the alleged releases of hazardous substances due to accidents, Plaintiffs allege that Defendants have illegally disposed of radioactive waste until at least July, 1994 resulting in further releases. *Id.* at ¶ 94.

As a result of Defendants' alleged releases of hazardous substances from the Rocketdyne Facilities into the air, groundwater, and soil within the "Contamination Area," Plaintiffs contend that the Class is at an increased risk of developing health problems similar to Plaintiffs' due to the Class' exposure to "radiation, plutonium, cesium, tritium, hexavalent chromium, TCE, and other toxic substances." *Id.* at ¶ 105. Plaintiffs assert that this exposure "has substantially increased the risk that Plaintiffs and the Class will develop cancer in the near future, if they have not done so already, which risks can be determined through common proof of the known health risks posed by such hazardous substances." *Id.* at ¶ 106.

In addition to the above potential health problems, Plaintiffs contend that they have incurred response costs in order to clean

---

**2.** But see BNA's Answer at ¶¶ 56–57, where BNA denies that Defendants Rockwell Manufacturing Company and Rockwell Standard Corporation owned or operated any of the Rocketdyne Facilities.

contaminated property and provide for alternative water supplies as a result of Defendants' alleged releases of hazardous substances into the environment. *Id.* at ¶¶ 112–13. Plaintiffs allege that because of Defendants' activities at the Rocketdyne Facilities, Plaintiffs have suffered economic damages including "physical damage to their property, past lost use of their property and past loss of enjoyment of their property." *Id.* at ¶¶ 173, 180, 185, 190, 204. Plaintiffs further contend that Defendants' alleged releases of hazardous substances have resulted in the diminution in value of Plaintiffs' property, "impairment of the salability of their property, stigmatization of their property, and losses related to residual toxic contamination of their property." *Id.* at ¶ 195.

On behalf of the Class, Plaintiffs seek response costs permitted under CERCLA; the creation of a fund to establish a medical monitoring program "to ensure the early detection and treatment of any latent diseases, illnesses and/or other health problems for members of the Class who, as a result of their exposure to the ... substances released into the Contamination Area from the Rocketdyne Facilities, have an increased risk of such health problems;" compensatory damages; injunctive relief requiring Defendants to make public information regarding the risks associated with the alleged activities at the Rocketdyne Facilities, to refrain from discharging further hazardous substances into the environment, and to remedy conditions allegedly caused by Defendants' release of hazardous substances; declaratory relief; and punitive and exemplary damages. *Id.* at 51:11 to 52:19.

## II. Discussion

### A. Standard

 Class actions are governed by Federal Rule of Civil Procedure 23 ("Rule 23"). The Party seeking class certification bears the burden of demonstrating that all four prerequisites of Rule 23(a) have been met and at least one of the requirements of Rule 23(b).[3] *Rex v. Owens,* 585 F.2d 432, 435

---

**3.** Of Course, the party seeking class certification must demonstrate that any proposed subclasses

(10th Cir.1978); *Doninger v. Pacific Northwest Bell, Inc.,* 564 F.2d 1304, 1308 (9th Cir.1977); *Gillibeau v. Richmond,* 417 F.2d 426, 432 (9th Cir.1969); *see also* 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1759 at 102–04 (1986). However, whether to certify a class is within the "trial court's considered discretion." *Doninger,* 564 F.2d at 1309 (quoting *Price v. Lucky Stores, Inc.,* 501 F.2d 1177, 1179 (9th Cir. 1974)). In certifying a class, the court should keep in mind the dual purposes of Rule 23:(1) to promote judicial economy through the efficient resolution of multiple claims in a single action; and (2) to provide persons with smaller claims, who would otherwise be economically precluded from doing so, the opportunity to assert their rights. Wright, Miller & Kane § 1754 at 49; Schwarzer, Tashima & Wagstaffe, Cal.Prac. Guide: Fed.Civ.Pro. Before Trial § 10:225 (The Rutter Group 1997).

 Before certifying a class, the court "must conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met." *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227 (9th Cir.1996) citing *In re American Medical Sys.,* 75 F.3d 1069 (6th Cir. 1996). However, "an inquiry into the merits of the claims of the representative or the class is inappropriate when making the decision whether the action should be certified under Rule 23." Wright, Miller & Kane § 1759 at 99; *see also Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 178 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Valentino,* 97 F.3d at 1232. Nevertheless, the court may find it necessary to look beyond the pleadings at the substantive claims of the parties to determine whether the elements of Rule 23 have been met. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (determining class certification "generally involves considerations that are 'enmeshed in the factual and legal issues com-

---

meet Rule 23's requirements, as well.

prising the plaintiff's cause of action.'"); *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996) (explaining that the "court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met."); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992) (finding that the court may consider evidence to ascertain whether Rule 23 has been met although the evidence relates to the merits); *In re Unioil Sec. Litig.,* 107 F.R.D. 615, 618 (C.D.Cal.1985) ("notwithstanding its obligation to take the allegations in the complaint as true, the Court is at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case.").

The party seeking class certification must first establish that the following prerequisites of Rule 23(a) are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.Pro. 23(a).

In addition, to maintain a class action the proponent must demonstrate that either (1) there is a risk that prosecution of separate actions would create a risk of incompatible standards of conduct for the party opposing certification or create a risk of prejudice to individual class members not parties to the actions; (2) injunctive or declaratory relief would benefit the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and the class action is the superior method for a fair and efficient adjudication of the case. Fed.R.Civ.Pro. 23(b).

## B. Rule 23(a) Prerequisites

### 1. Numerosity

#### a. *Standard*

■ Rule 23(a)(1) requires that a class be so numerous that joinder is impracticable. To satisfy Rule 23's requirements, the propo-

nent must first establish that a class does in fact exist. Wright, Miller & Kane, § 1760 at 115. A class definition should be "precise, objective, and presently ascertainable." Manual for Complex Litigation, Third § 30.14, at 217 (1995). However, the class need not be "so ascertainable that every potential member can be identified at the commencement of the action." Wright, Miller & Kane, § 1760 at 117. As long as "the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." *Id.* at 118. Thus, a class will be found to exist if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member. *See Aiken v. Obledo,* 442 F.Supp. 628, 658 (E.D.Cal.1977). Finally, due to notice requirements, class definitions of actions maintained under Rule 23(b)(3) command greater precision than those brought under Rule 23(b)(1) or (b)(2). Manual for Complex Litigation, Third § 30.14, at 217.

■ Next, the party seeking certification must demonstrate that the size of the class defined makes joinder impracticable. The proponent need not, however, show that joinder is impossible. *See e.g., Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909 (9th Cir.1964). Because the courts have not articulated an exact numerical cut-off, whether the numerosity requirement has been met depends on the facts of each case. *See e.g., General Tel. Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980); *Perez–Funez v. District Director, I.N.S.,* 611 F.Supp. 990, 995 (C.D.Cal.1984). Although the proponent is not required to establish the exact number of potential class members, a bare allegation of numerosity is insufficient to meet Rule 23's prerequisite. *See Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925 (11th Cir.1983); *Vergara v. Hampton,* 581 F.2d 1281, 1284 (7th Cir.1978), *cert. denied,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979).

#### b. *Analysis*

The Court will first examine Plaintiffs' proposed class definition to determine if a class in fact exists. Plaintiffs define both the

Class and Property Owner Subclass according to a geographic area allegedly exposed to Defendants' alleged releases of hazardous substances ("Contamination Area"). SAC at ¶¶ 62–63. Plaintiffs' determination of the Contamination Area is based in part on groundwater velocities indicating fracture flow that allegedly suggest that any contamination from the Rocketdyne Facilities moved into the Contamination Area. Motion at 13:13–15; Thieleman Decl.Ex. 33 at 7 (*Results of Pilot Tracer Testing at Wells RD–9 and WS–SP, Rockwell International Corp., Rocketdyne Div., SSFL, Ventura County, CA*). Plaintiffs also look to Defendants' report of the existence of a "hydraulic gradient" between the groundwater underlying the Santa Susana Field Laboratory ("SSFL") (a Rocketdyne Facility) and the groundwater within the San Fernando and Simi Valleys "and that fractures trending off-site could provide the pathways to those aquifers." Motion at 13:13–18; Reply at 18:8–15; Thieleman Decl.Ex. 18 at BNA 043478 (*Phase I Investigation of Hydrogeologic Conditions, SSFL, Ventura County, CA*). In addition, Plaintiffs contend that the Class definition is adequate based on BNA's expert's opinion from the *Klea* action that "radioactive materials originating from SSFL were dispersed within a ten mile radius of the facility ... [and that] [t]his ten mile radius encompasses the boundaries of the Contamination Area." Reply at 18:18–21; Schofield Decl. at Ex. E (Woodward Decl. at ¶¶ 8, 11, Ex. C) (determining how radioactive isotope emissions from SSFL were distributed within a ten-mile radius and finding that the measured releases were "very low and well within regulatory limits").

BNA, on the other hand, argues that "Plaintiffs offer no evidentiary basis for their arbitrary selection of this geographic area...." Opp. at 15:12–13. Instead, BNA contends that the boundaries of the Contamination Area are arbitrary, that Plaintiffs have not explained why these boundaries were chosen, and that Plaintiffs cannot present evidence regarding exposure to hazardous substances. *Id.* at 18:12–15; 19:2–4. Thus, BNA asserts that Plaintiffs' motion for class certification should be denied because

the court will not be able to identify individual members of the Class until it "reach[es] an ultimate conclusion on the disputed factual and legal issues in the case." *Id.* at 20:1–5.

Because "general outlines of the membership of the class" are all that are required for Rule 23, Courts have found that a definable class may be established by geographic boundaries. *See e.g., Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 60–61 (S.D.Ohio 1991) (certifying class defined as persons within six miles of boundaries of plant that released hazardous materials); *Yslava v. Hughes Aircraft Co.*, 845 F.Supp. 705, 712 (D.Ariz.1993) (certifying class based on geographic areas in which plaintiffs lived and went to school where defendant supplied contaminated drinking water); *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D.Col.1993) (certifying class defined by geographic boundaries based on dose or exposure contours of radioactive and non-radioactive materials); *Reilly v. Gould, Inc.*, 965 F.Supp. 588, 596 (M.D.Pa.1997) (finding definable class existed based on geographic boundaries that established class members, but ultimately granting defendant's motion to dismiss class action). However, while Plaintiffs need not prove that class members have been injured for purposes of defining the Class,[4] Plaintiffs' class definition must have some relation to the Defendants' activities. *See Daigle v. Shell Oil Company*, 133 F.R.D. 600, 602–03 (D.Col.1990) (concluding that plaintiffs failed to identify a class defined by geographic boundaries because plaintiffs "failed to identify any logical reason relating to the defendants' activities."). Thus, to determine whether Plaintiffs have adequately defined their class based on the Contamination Area, the Court should ask:

(1) is there any evidence that the [Rocketdyne Facilities] ha[ve] discharged radioactive or hazardous substances beyond its borders? And

(2) if so, have those substances traveled up to [the geographic area which defines the Class]?

*Boggs*, 141 F.R.D. at 61.

Plaintiffs have established that some hazardous substances have traveled off of the

---

4. Such an inquiry would require the Court to delve into the merits of Plaintiffs' case, an inappropriate inquiry at this stage. *See Valentino*, 97 F.3d at 1232.

Rocketdyne Facilities sites. For instance, Defendants admit that "TCE has been detected in groundwater under limited portions of [BBI] ... in concentrations above federal drinking water standards." Opp. at 11:4–6; Schofield Decl.Ex. A at ¶ 5.f (BBI Pre-trial Order). Defendants also admit that radionuclides were found "above background levels in two localized areas of BBI immediately adjacent to the SSFL property line." *Id.* at ¶ 6.i. Finally, Keith Woodward, hired to analyzed radioactive emissions at SSFL, calculated airborne exposure levels within a ten-mile radius of SSFL. Woodward Decl. ¶ 11.

However, none of these admissions (with the exception of the Woodward declaration) show that the emissions traveled off-site to the extent of the Contamination Area. Rather, Plaintiffs argue that it is "both *plausible* and *probable* that toxic or radioactive materials migrated off-site, contaminating the adjoining populations." Motion at 14:7–8 (emphasis added). In addition, Plaintiffs' citations to admitted off-site contamination relate to small adjacent areas that do not encompass the entire Contamination Area.[5] With respect to the Woodward declaration, while the ten-mile radius Woodward examined may encompass the entire Contamination Area, the releases of radioactive materials were found to be "very low and well within regulatory limits." Woodward Decl. ¶ 8. Although Plaintiffs correctly argue that the determination of actual exposure levels is a merit based issue, "courts are not likely to allow a class action if convinced that

there is no realistic chance of success." *Haley v. Medtronic, Inc.,* 169 F.R.D. 643, 647 (C.D.Cal.1996) (citing *Orlett v. Cincinnati Microwave, Inc.,* 953 F.2d 224, 228 (6th Cir.1990)). Because Plaintiffs rely on Woodward's projection of emission levels, they must also accept his findings that the releases of radioactive isotopes were within regulatory limits. Thus, Plaintiffs do not have a realistic chance of success of winning their claims based on the release of these emissions.

However, Plaintiffs do not rest their claims on the dispersion of radioactive isotopes alone. Plaintiffs allege that hazardous, toxic, and carcinogenic substances also were released from the Rocketdyne Facilities resulting in Plaintiffs' economic and physical harm. SAC at ¶ 2. Nevertheless, Plaintiffs fail to provide evidence that these substances have traveled across the entire Contamination Area. In addition, the majority of materials that Plaintiffs rely on to demonstrate the "possibility" that hazardous substances have been released within the Contamination Area relate to the SSFL facility only,[6] although Plaintiffs claim that activities from additional facilities contributed to Plaintiffs' harm. *See* SAC at ¶ 2. Thus, while Plaintiffs have shown that hazardous substances have been released outside the borders of the Rocketdyne Facilities (at least outside SSFL), Plaintiffs have failed to provide the Court with sufficient evidence showing that these releases traveled throughout the entire Contamina-

---

5. For example, TCE concentrations well above the regulatory maximum levels were found in groundwater off-site from SSFL. Schofield Decl. Ex. J at ¶¶ 6–9 (Lafflam Decl.). However, these high level concentrations were specifically found on the BBI property. Plaintiffs have not provided additional evidence of contaminated groundwater throughout the Contamination Area, whether at high or low levels.

6. Both the groundwater velocities and hydraulic gradient that Plaintiffs allege could have resulted in the migration of contamination throughout the defined Class area relate to SSFL. Thieleman Decl.Ex. 33 at 7; Ex. 18 at BNA 043478. Furthermore, although groundwater velocities at the fracture beneath SSFL could be up to 250 feet per day, these velocities "may or may not be indicative of flow velocities beneath the SSFL as a whole, or at any other specific site." *Id.* Ex. 33

at 7–8. See also, *id.* Ex. 16 at 21 (*Summary Review of Preliminary Assessments/Site Inspections of Rockwell Int'l SSFL*), which finds that groundwater below the SSFL site is contaminated, but that also reports that "[o]ff-site well testing has not shown any groundwater contamination migration away from the facility, although this may be due to a lack of effective off-site monitoring," and that "extensive on-site groundwater pumpage ... may be preventing groundwater flow from leaving the site." Furthermore, the *Preliminary Assessment Report, SSFL—Area II, Rockwell Int'l Corp.—Rocketdyne Div., Ventura County, CA,* written in 1988, concluded that "[i]n spite of the long history of solvent usage at the [SSFL], there is *no evidence* indicating that groundwater contaminants have moved off-site." *Id.* Ex. 8 at BNA 008112.

**370**

tion Area.[7]

■ Because the Court finds that Plaintiffs' definition of the Class based on the geographic boundaries of the Contamination Area is not definite enough, the Court need not determine whether the Class is so numerous that joinder is impracticable. However, if Plaintiffs were to sufficiently define a Class exposed to the hazardous substances Plaintiffs allege were released from the Rocketdyne Facilities, presumably the Class would meet the numerosity prerequisite of Rule 23. In addition, because the Court is cognizant of the fact that Plaintiffs may seek to certify the Class in the future based on a more definite definition, the Court will consider each of the requirements that Plaintiffs must satisfy to maintain a class action.

### 2. Commonality

#### a. *Standard*

■ According to Rule 23(a)(2), a class action is maintainable only if "there are questions of law or fact common to the class." However, not every issue in the case must be common to all class members. Schwarzer, Tashima & Wagstaffe § 10:262. The fact that individual issues remain "after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188 (6th Cir.1988). Rather, there must be some issue involved that is common to the entire class and relief must " 'turn on questions of law applicable in the same manner to each member of the class.' " *General Tel. Co.*, 457 U.S. at 155, 102 S.Ct. at 2369 quoting

*Califano v. Yamasaki*, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 2557–2558, 61 L.Ed.2d 176 (1979). Thus, class certification is appropriate where "common issues (of fact or law) [are] of sufficient importance to the class that the court is convinced that the most efficient method of determining the rights of the parties is through a class action." Schwarzer, Tashima & Wagstaffe § 10:263.

#### b. *Analysis*

##### (1) Common Issues to the Class

BNA contends that the claims of the Class do not present common questions, but rather turn on individual circumstances. Opp. at 23. Specifically BNA argues that in order to determine if medical monitoring is an appropriate form of relief for the Class, individual variables must be taken into account, such as exposure level, length of exposure, the particular substances involved, the pathways of exposure, and individual lifestyle factors. *Id.* at 25. Furthermore, Defendants argue that because the alleged releases occurred at different times, from different sites and involved different hazardous substances, no single course of conduct exists for which BNA's liability would be a common issue to the Class. *Id.* at 27:8 to 28:5. Therefore, because "BNA's duty and liability would have to be determined for each alleged injury-causing incident," commonality is destroyed. *Id.* at 28:2–5.

■ Class certification, however, is not defeated merely because "facts fluctuate over the class period and vary as to individual claimants," if there are common questions as to "liability or as to the cause or impact of

7. See *Boggs*, 141 F.R.D. at 62, where the court explained that "[t]he fact that radioactive materials have escaped the confines of the plant is, by itself, not sufficient to justify defining the class to include everyone who lives or owns property within six miles of the plant's boundaries." Rather, the party seeking certification should provide some evidence that the class definition is reasonable. *Id.* The court in *Boggs*, therefore, examined plaintiffs' evidence of dispersion and held that because plaintiffs' expert found that radioactive materials were released beyond the six-mile boundary, plaintiffs' definition of the class was sufficiently definite. *Id.*

Plaintiffs' Class definition is also distinguishable from *Cook*, and *Yslava*. In *Cook* the geo-graphic boundaries were based on exposure levels received by the population living within the defined geographic area and in *Yslava*, the boundaries encompassed areas where the defendant provided contaminated drinking water. As explained above, while Plaintiffs rely on Woodward's mapping of exposure levels within the Contaminated Area, Woodward's study also found that releases from SSFL were within regulatory limits. Furthermore, Woodward's study of emissions related only to SSFL and only to radioactive isotopes, although Plaintiffs allege emissions of other hazardous substance from other facilities also occurred.

the tortious action." *Yslava*, 845 F.Supp. at 712 (quoting *In re Asbestos School Litigation*, 104 F.R.D. 422, 429 (E.D.Pa.1984)). Plaintiffs contend that questions regarding Defendants' activities at the Rocketdyne Facilities are common to the Class, such as whether the alleged release of hazardous substances by Defendants created an increased risk of illness for the Class; whether Defendants are absolutely liable for any injuries or damages resulting from these activities; whether Defendants in the course of these activities breached duties of care owed to the Class; and whether Defendants' alleged releases of hazardous substances violated CERCLA.[8] Motion at 22.

 In other words, Plaintiffs seek to establish by common proof that Defendants' conduct in operating, owning, or managing the Rocketdyne Facilities was negligent, subject to strict liability, and/or in violation of CERCLA. Although damages may vary for each individual class member, these questions regarding Defendants' liability for their "course of conduct" at the Rocketdyne Facilities and whether Defendants' alleged releases of hazardous substances have placed the Class at a potentially increased risk of health problems do not vary from class member to class member.[9] Relief for the Class turns on these significant common "questions of law applicable in the same manner to each member of the class." [10] *General Tel. Co.*, 457 U.S. at 155, 102 S.Ct. 2364, 72 L.Ed.2d 740. Furthermore, many of the issues that Defendants raise relate to Rule 23(b)(3)'s predominance element, which involves an examination by the Court that is much more meticulous than the commonality requirement of Rule 23(a)(2). *Amchem Products, Inc.*, —— U.S. at ——, 117 S.Ct. at 2250 (finding that "the predominance criterion is far more demanding" than the commonality requirement).[11] Therefore, because

**8.** In *Yslava*, which involved facts similar to the instant case, the court found that plaintiffs seeking certification of a class exposed to contaminated drinking water and seeking relief in the form of medical monitoring satisfied the commonality requirement. *Yslava*, 845 F.Supp. at 713. Specifically, the court held issues regarding the defendant's liability under "CERCLA and various state laws relative to the disposal of hazardous material are legal issues common to the entire class." *Id.* at 712. Further, the court found the existence of factual commonality in that "each proposed class member lived, worked or went to school within certain specified geographical areas and were exposed to contaminated water." *Id.* at 712–13. The court continued to explain that variations in the defendant's conduct and variation in susceptibility of disease among class members did not defeat commonality. *Id.* at 713. While the Court has found that the Plaintiffs have failed to adequately define their Class based on the Contamination Area, if the Plaintiffs were to define a class area where contamination had been released, then presumably the class members would also share this factual commonality of living or working in an area exposed to hazardous substances.

**9.** *See In re Asbestos School Litigation*, 104 F.R.D. 422, 429 (E.D.Pa.1984), *aff'd (re Rule 23(a)) in part, rev'd in part*, 789 F.2d 996 (3rd Cir.1986) (holding that elements of defendants' breach of legal duties "can be established by common proof, which, although it may be complex, does not vary from class-member school to class-member school," and thus plaintiffs satisfied commonality prerequisite); *see also In re Telectronics Pacing Systems, Inc.*, 168 F.R.D. 203, 213 (S.D.Ohio) (finding that plaintiffs satisfied Rule 23(a)(2) where plaintiffs presented evidence that Defendant's conduct caused the product defect).

**10.** Plaintiffs seek the remedy of a medical monitoring claim. Whether Defendants released hazardous substances which could pose a health risk to members of the Class is a common question from which this remedy derives. The fact that individual issues may impact the availability of medical monitoring for specific class members relates to the predominance inquiry discussed below.

**11.** Likewise, the court in *Arch v. The American Tobacco Co.*, 175 F.R.D. 469, 476–77 (E.D.Pa. 1997), distinguished *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3rd Cir.1996), *cert. granted on other grounds*, —— U.S. ——, 117 S.Ct. 379, 136 L.Ed.2d 297 (1996), finding that the commonality requirement is stricter where the class seeks to resolve non-common issues of liability and damages, because *Georgine* found that the class failed the commonality prerequisite " 'because the test of commonality is subsumed by the predominance requirement.' " The court then proceeded to find that plaintiffs satisfied the commonality requirement by demonstrating the common questions of whether defendants acted in concert and whether defendants' conduct warranted punitive damages. *Arch*, 175 F.R.D. 469, 477–78. Similarly, while questions common to the Class may not *predominate* over the individual issues that Defendants have raised, Plaintiffs have raised several questions common to the Class, as explained above, which include whether Defendants' alleged emissions constitute a health hazard.

there are key issues of fact or law regarding Defendants' conduct that are common to the Class, the Court finds that the Plaintiffs have satisfied the commonality requirement as it applies to the Class.

### (2) Common Issues to the Subclass

As with the Class, Plaintiffs contend that questions regarding Defendants' conduct are common to the Property Owner Class.[12] BNA argues, however, that the claims of the Subclass do not turn on common issues, because "[i]ndividualized proof would be necessary, at the outset, to find out whether a given property owner has a contamination claim." Opp. at 20–22. However, as discussed above, questions regarding whether Defendants breached a duty with regard to their activities at the Rocketdyne Facilities, whether Defendants should be held strictly liable for those activities, and whether Defendants' alleged activities constitute a nuisance, are all common to the members of the Property Owner Subclass. Again, the fact that individualized issues exist does not defeat a commonality claim, although it may impact the predominance and superiority inquiries of Rule 23(b)(3).

### 3. Typicality

#### a. *Standard*

▮▮▮▮ Under Rule 23(a)(3), the court may certify a class action only where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality prerequisite may be met "even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages by the representative parties and the other members of the class." Wright, Miller & Kane § 1764, at 235–41. Thus, while the class representatives' claims need not be identical to those of absent class members, the class representatives must " 'possess the same interest and suffer the same injury' as the class members." *General Tel.*

*Co.*, 457 U.S. at 156, 102 S.Ct. at 2370; *see also CRLA v. Legal Services Co.*, 917 F.2d 1171, 1175 (9th Cir.1990) (opining that Rule 23 "does not require that the named plaintiffs . . . be identically situated with all other class members. It is enough if their situations share a 'common issue of law or fact' "); *Weinberger v. Jackson*, 102 F.R.D. 839, 844 (N.D.Cal.1984) (citing Newberg on Class Actions, § 8816, at 850 (1977) for the proposition that "the typicality requirement should be loosely construed."). The party seeking class certification will satisfy rule 23(a)(3)'s typicality requirement if the representatives' claims stem from the same event or course of conduct as other class members' claims and are based on the same legal theory as the absent members. *See Rosario v. Livaditis*, 963 F.2d 1013, 1019 (7th Cir.1992); *see also In re United Energy Corp., Etc., Sec. Litig.*, 122 F.R.D. 251, 256 (C.D.Cal.1988).

#### b. *Analysis*

#### (1) Typicality of Class Representatives Claims

Plaintiffs contend that the Representative Plaintiffs' claims are typical of the class because they "arise from the same course of conduct by Defendants—namely, the release of hazardous, toxic and radioactive substances from the Rocketdyne Facilities . . . [and] the Representative Plaintiffs are pursuing the same legal and remedial theories as the members of the Class and the Property Owner Subclass." Motion at 24:19–24. BNA argues, however, that Plaintiffs have failed to meet their burden to establish the typicality of the Representative Plaintiffs' claims. BNA's argument focuses on the fact that individual issues must be taken into account to determine each class member's exposure level in order to demonstrate that relief in the form of medical monitoring is appropriate. Opp. at 33:1–13.

Plaintiffs further assert that because the medical monitoring program rests on estab-

---

12. In their Reply, Plaintiffs cite to questions found common to the class in *Cook* that Plaintiffs contend are similar to those posed in the instant case, such as "whether defendants' operation[s] . . . involved an ultrahazardous activity, . . .

posed an unreasonable risk of harm, constituting negligence, and/or amounted to interference with the use or enjoyment of property constituting a nuisance." *Cook*, 151 F.R.D. at 382.

lishing common legal theories, the Representative Plaintiffs' claims are typical of the Class because typicality "focuses on whether the class representative plaintiffs have claims that are typical of those of the other members of the class" rather than on a "proximate cause inquiry." Reply at 26:5–10. Furthermore, Plaintiffs contend that they have established typicality because the Representative Plaintiffs seek the same remedies, medical monitoring and recovery of response costs, as other members of the Class. *Id.* at 26:10–15.

It is true that representatives of a class need not have claims identical with absent members of the class for their claims to satisfy the typicality requirement. *General Tel. Co.,* 457 U.S. at 156, 102 S.Ct. at 2370. In addition, typicality may exist although there is a disparity in the damages or factual patterns of the class representatives and other class members. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 1764, at 235–41. However, it is also true that the class representatives should have the same interest and injury as the absent class members. *General Tel. Co.,* 457 U.S. at 156, 102 S.Ct. at 2370.[13] While the Representative Plaintiffs' claims are the same as the Class, in that all of the Plaintiffs seek to establish negligence, strict liability and CERCLA

claims, their injuries are not. Of the eight representatives, half have been diagnosed with cancer, and those without cancer have a child or spouse with cancer. SAC at ¶¶ 8–13. Thus, the Representative Plaintiffs' interest in establishing a medical monitoring program based on their claims is not aligned with that of class members who have not yet suffered any physical injury. The Representative Plaintiffs' focus will be on treatment of their diseases[14] and their loved ones' diseases, while non-diseased class members will direct their claims to recover costs of monitoring latent diseases.[15]

Plaintiffs cite to both *Boggs* and *Cook* to support their contention that they have satisfied Rule 23(a)'s typicality requirement. In *Boggs,* the representative plaintiffs all sought medical monitoring for early cancer detection due to exposure to radioactive materials released from a nearby plant. *Boggs,* 141 F.R.D. at 60. The court found that the typicality requirement was satisfied because the representatives brought the same claims stemming from the common event of Defendants' release of hazardous substances. However, *Boggs* is distinguishable because none of the class representatives claimed to have been afflicted with any disease. *Id.,* at 64. Thus, the *Boggs'* representatives' claims could be found "typical" because they shared

---

**13.** *See also Valentino,* 97 F.3d at 1234 (finding that the class representatives' claims may not be typical of the class because none of the representatives had experienced the most serious condition associated with the defective product, and therefore, the named plaintiffs *might not* adequately represent the class); *In re American Medical Sys., Inc.,* 75 F.3d 1069, 1082 (6th Cir.1996) (finding that a "necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.") (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions,* § 313, at 3–75 (3d ed.1992)); *Georgine,* 83 F.3d at 631 (opining that the typicality inquiry "assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented."); *In re Telectronics Pacing Systems, Inc.,* 168 F.R.D. at 214 (explaining that "[w]hile a representative's claims need not mimic the claims of every class member, the plaintiff must *advance the interests of the class members.").

**14.** In fact, the four Representative Plaintiffs with cancer also seek individual personal injury claims.

**15.** It is unclear to the Court how the Representative Plaintiffs already diagnosed with cancer would benefit from relief in the form of a medical monitoring program designed to ensure early detection of latent diseases. SAC at 51:15. The Court is also confused as to the nature of the medical monitoring program itself. While it is designed *to detect* and then treat latent diseases (*Id.*), does this also mean that a medical *monitoring* program will provide treatment for those already diagnosed? To the Court *monitoring* suggests that the program will look for signs of disease not yet diagnosed in Class members. The Representative Plaintiffs currently suffering from cancer, therefore, would not benefit from such a program and thus would have adverse interests to Class members who fear future disease. Furthermore, the Representative Plaintiffs who do not currently have cancer do not necessarily share the same interest as Class members who seek medical monitoring, because these Plaintiffs all have close relatives presently diagnosed with cancer.

the same interest and injury as those of the Class, unlike the Representative Plaintiffs in the instant action, as explained above. *Id.* at 65–66.

■ Similarly, in *Cook* the court found that the class representatives' claims were typical of classes seeking medical monitoring and property damages because they arose "from the same set of circumstances, the release of hazardous nuclear and non-nuclear substances from the plant." *Cook,* 151 F.R.D. at 386. While individual proof of exposure levels, risk, and contamination might vary with each claimant, the court found that this did not defeat typicality, citing *In re Asbestos School Litigation,* 104 F.R.D. at 430 ("While the focus is on the relatedness of the named plaintiffs' claims and those of the class members, the harm suffered by the named plaintiffs may differ in degree from that suffered by other members of the class so long as the harm suffered is of the same type."). *Id.* at 386. As in *Boggs,* however, the representatives in *Cook* did not already have cancer and sought damages for mental and emotional distress and medical monitoring. *Id.* at 380. Again, although Plaintiffs' claims arise from Defendants' alleged release of hazardous substances, the harm they have suffered is *not* the same type as that suffered by other class members because the Representative Plaintiffs are already diagnosed with cancer. Therefore, the Court cannot find that Plaintiffs' claims are typical of the Class they seek to represent, as was done in *Boggs* and *Cook,* because Plaintiffs will not advance the interests of those class members seeking medical monitoring for early detection of disease.

(2) Typicality of Property Owner Subclass Representatives' Claims

■ Each of the Representative Plaintiffs also purport to represent members of the Property Owner Subclass. Plaintiffs assert that the claims of the Representative Plaintiffs are typical of the Subclass for the same reasons discussed above. Motion at

24:19–24. Likewise, BNA contests that Plaintiffs have not met their burden to establish that their claims are typical of other property owners' claims. Opp. at 35:3–4. However, unlike the Class, the Court finds that the Representative Plaintiffs' claims on behalf of the Property Owner Subclass do satisfy the typicality requirement. First, the claims are based on the same legal theories as the claims brought on behalf of the Class, such as negligence, strict liability, and CERCLA violations. In addition, the Plaintiffs will advance the interests of the Subclass because all Representatives own property allegedly exposed to hazardous substances due to Defendants' conduct. Unlike their claims on behalf of the Class, Plaintiffs' claims for damages for their property do not conflict with other property owner's claims for similar damages.

BNA argues, however, that the Representative Plaintiffs' claims cannot be typical of the Subclass because Plaintiffs' properties are all single family residences, while 60% of the properties in the class are non-residential. Opp. at 34:2–5. Further, BNA contends that the Representative Plaintiffs have yet to discover any contamination on their properties or spend monies on clean-up. *Id.* at 32:9–12. While it is true that many different types of property exist within the Subclass, all owners of property within the subclass will seek similar remedies from their claims, mainly money damages for any injury caused to the property from Defendants' alleged releases of harmful substances.[16] The type of property in question is an individual issue that will address the amount of damages available to the claimant rather than the nature of the remedy itself, unlike the individual issues involving the claims seeking medical monitoring. Thus, while the Representative Plaintiffs may not be "identically situated with all other [Sub]class members," because the Plaintiffs share the same injury and interest of potentially contaminated property, Plaintiffs' claims are typical of

16. See, for example, *Cook,* 151 F.R.D. at 385–86, where the court found that, because the claims arose from "the same set of circumstances," the factual differences underlying each person's claims for damages to their property did not "create any conflict between plaintiffs and the potential class members."

those of the members of the Property Owner Subclass.[17] *CRLA,* 917 F.2d at 1175.

### 4. Adequacy of Representation

#### a. *Standard*

 Rule 23(a)(4) provides that certification of a class action is only appropriate where "the representative parties will fairly and adequately protect the interests of the class." The adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 2250, 138 L.Ed.2d 689 (1997). Whether the class representatives will adequately represent the class depends on the circumstances of each case. *McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir.1981). The Ninth Circuit has held that representation is "adequate" where counsel for the class is qualified and competent, the representatives' interests are not antagonistic to the interests of absent class members, and it is unlikely that the action is collusive. *In re Northern Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 855 (9th Cir.1982) ("Dalkon Shield"); *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978). Representation will most likely be adequate where the representative's interests are comparable to those of the absent class members, similar to the typicality inquiry of Rule 23(a)(3). Schwarzer, Tashima & Wagstaffe § 10:306. However, "only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 1768, at 326–27. In addition, while the size

of an individual representative's interest is not irrelevant to the adequacy inquiry, the extent of a representative's interest is not a determinative factor. *Id.* § 1767, at 318–19.

#### b. *Analysis*

##### (1) Adequacy of Representatives for the Class

 The typicality and adequacy of representation inquiries are closely related. Adequate representation turns on the representatives' interests as compared to the interests of the absent class members, similar to the typicality requirement. Because the Plaintiffs' claims are not typical of the class members who seek medical monitoring, the Plaintiffs cannot adequately represent the class. As explained above, Plaintiffs' interests conflict with those of the Class, because many of the Representative Plaintiffs will not benefit from a medical monitoring program, a key remedy sought by the Class.[18] Furthermore, also discussed above, the Representative Plaintiffs without cancer may acquire a conflict of interest with the Class they seek to represent, because their close relatives are afflicted with cancer. This type of conflict is precisely what the adequacy inquiry is designed to uncover.[19] Furthermore, this conflict is one that "goes to the very subject matter of the litigation," because it directly relates to how the Class will be made whole from Defendants' allegedly tortious conduct. Because the interest of the Representative Plaintiffs in the medical monitoring remedy is fundamentally at odds with absent class members' interests, the Court finds that the named Plaintiffs cannot fairly and adequately

**17.** The Court finds that the Representative Plaintiffs' claims are typical of the Property Owner Subclass as of this time. However, the Court recognizes that its opinion may change depending upon future soil readings, remediation, or other findings called to the Court's attention.

**18.** Each claim sought on behalf of the Class as a whole, seeks medical monitoring, except for the claim brought under CERCLA. SAC at 51:13–28.

**19.** *See Amchem Products, Inc.,* —— U.S. at ——, 117 S.Ct. at 2250. While the class in *Amchem* revolved around settlement, the class faced simi-

lar issues with regard to adequacy of representation. For example, the Supreme Court upheld the Third Circuit's finding that the named plaintiffs would not adequately represent the class, because the named parties with varying medical conditions sought to represent a class which included uninjured, exposure-only claimants. *Id.* at ——, 117 S.Ct. at 2251. This factual difference between the representatives and absent class members created a conflict because the currently injured representatives' goal was immediate damages, while those who had only been exposed desired a future fund for medical monitoring. *Id.*

protect the interests of the Class seeking medical monitoring.

### (2) Adequacy of Representatives for the Subclass

■ Again, similar to the Court's inquiry into the typicality of Plaintiffs' claims, the Court finds that because Plaintiffs share the same interest in both determining Defendants' liability and the relief sought as to the Property Owner Subclass, the named Plaintiffs will adequately represent the Subclass. Unlike the conflicts surrounding the Class seeking medical monitoring, any differences between the Representative Plaintiffs' and absent members of the Subclass' situations do not involve the subject matter of the litigation. Rather, as explained in the Court's typicality analysis, the Representative Plaintiffs share the same interest as the absent members of the Subclass—compensation for possible contamination to their property. The fact that different properties may have incurred different injuries resulting in an award of varying damages, does not preclude Plaintiffs from providing adequate representation to the Subclass members. An interest by the named Plaintiffs in diverse damage awards does not constitute "antagonism" to the absent property owners within the Subclass. *Dalkon Shield*, 693 F.2d at 855 (explaining that "absence of antagonism" is a factor to determine adequacy of representation). Therefore, at this time, the Court finds that the named Representatives can adequately and fairly represent the absent members of the Subclass because no conflict of interest yet exists.[20]

### C. Rule 23(b) Requirements

After satisfying Rule 23(a)'s four prerequisites, the party seeking certification must demonstrate that the action satisfies the requirements of one of Rule 23(b)'s sections in order to maintain the class action. Plaintiffs

contend that certification of the Class is proper under 23(b)(1)(A), 23(b)(2), and 23(b)(3). SAC at ¶ 64. Plaintiffs seek to certify the Property Owner Subclass solely under 23(b)(3). *Id.* at ¶¶ 69. Again, although the Court has determined that Plaintiffs do not satisfy the necessary prerequisites of Rule 23(a), because Plaintiffs may choose to seek certification of an alternative class in the future, the Court will continue its examination of Plaintiffs' assertions relating to the requirements of Rule 23(b).

### 1. Rule 23(b)(1)(A)

#### a. Standard

■ A class action is maintainable under Rule 23(b)(1)(A) if "prosecution of separate actions ... would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." However, certification under 23(b)(1)(A) is inappropriate "when separate actions would raise the same question of law." *McDonnell Douglas Corp. v. United States Dist. Ct. for Central Dist. of California*, 523 F.2d 1083 (9th Cir.1975). Rather, Rule 23(b)(1)(A) covers " 'cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners).' " *Amchem Products, Inc.*, —— U.S. at ——, 117 S.Ct. at 2245; *see also* Wright, Miller & Kane § 1773 at 433–34. Additionally, class certification under (b)(1)(A) is improper for a claim for damages. *Green v. Occidental Petroleum, Corp.*, 541 F.2d 1335, 1340 (9th Cir.1976); *McDonnell Douglas*, 523 F.2d at 1086; *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir.1973).

**20.** Again, as with its finding of typicality, the Court is aware that the named Plaintiffs may be found to be inadequate representatives of the Property Owner Subclass in the future. For example, if later determinations reveal that Plaintiffs' properties have not in fact been exposed or damaged by the alleged releases of hazardous substances by Defendants, then the Court could not find that Plaintiffs had established the adequacy criterion. Without actual exposure to contamination, the Representative Plaintiffs would lose any colorable claim of property damage that they might have had, and thus would no longer "possess the same interest and suffer the same injury as the Subclass members." *Amchem Products, Inc.*, —— U.S. at —— – ——, 117 S.Ct. at 2250–51 (citation and internal quotation marks omitted).

### b. *Analysis*

Plaintiffs maintain that the Class is certifiable under Rule 23(b)(1)(A) because the Class seeks relief in the form of Medical Monitoring for almost all of its claims. Motion at 27:10–12. BNA contends, however, that (b)(1)(A) certification is inappropriate because Plaintiffs seek damages for medical monitoring and because separate adjudications of Plaintiffs' claims would not result in inconsistent judgments requiring incompatible conduct. Opp. at 44:8–15.

■ The Court agrees with BNA and finds that certification of the Class under 23(b)(1)(A) is inappropriate in this case. Plaintiffs have failed to establish how separate actions in this case will create a risk of "inconsistent adjudications ... which would establish incompatible standards of conduct" for Defendants. First, Defendants will not be required to treat all members of the Class alike, because all class members may not qualify for relief in the form of medical monitoring and may not qualify for the additional compensatory, punitive, and exemplary damages that Plaintiffs also seek. *Amchem Products, Inc.,* —— U.S. at ——, 117 S.Ct. at 2245. Individual issues, such as exposure level, family history, and other risk factors, will dictate whether class members will qualify for the medical monitoring program Plaintiffs propose, which includes not only examinations, but treatment of diseases as well.[21] Second, the Court fails to understand how inconsistent adjudications will occur when future actions will be transferred to this Court as related cases.[22] Therefore, because Plaintiffs have not shown the Court a risk of separate actions establishing incompatible standards of conduct for the Defendants, the Court finds that the class cannot be maintained under Rule 23(b)(1)(A).

### 2. **Rule 23(b)(2)**

### a. *Standard*

■ Certification of a class action under Rule 23(b)(2) is appropriate only where final injunctive or declaratory relief with respect to the class as a whole is appropriate. Thus, Rule 23(b)(2) class treatment is unavailable where the primary relief sought by the class is monetary damages. *See, e.g., Nelsen v. King County,* 895 F.2d 1248, 1255 (9th Cir. 1990); *In re School Asbestos Litig.,* 789 F.2d at 1008; *Doninger,* 564 F.2d at 1314; *Haley,* 169 F.R.D. at 657. However, Rule 23(b)(2) may include cases seeking monetary damages where such relief is "merely incidental to their primary claim for injunctive relief." *Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776 (9th Cir.1986).

---

**21.** *See Smith v. Brown & Williamson Tobacco Corp.,* 174 F.R.D. 90, 99 (W.D.Mo.1997) (holding that when "the relief in question is fraught with individualized issues, resort to Rule 23(b)(1) is inappropriate," and that (b)(1) certification is not justified because individualized lawsuits might confer different results) (citing *In re Catawba Indian Tribe of South Carolina,* 973 F.2d 1133, 1137 (4th Cir.1992)). *See also, Yslava,* 845 F.Supp. at 713 (finding 23(b)(1) certification inappropriate for class seeking court-supervised medical monitoring program).

**22.** *See Reilly v. Gould, Inc.,* 965 F.Supp. 588, 601 (M.D.Pa.1997) (finding certification of similar class under Rule 23(b)(1)(A) inappropriate because risk of inconsistent adjudications was lacking where the court "has been ever mindful of its prior rulings"). Furthermore, the Court finds Plaintiffs' reliance on *In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271 (S.D.Ohio 1997) partial recertification of class decertified in *In re Telectronics Pacing Sys., Inc.,* 168 F.R.D. 203 (S.D.Ohio 1996), inapposite. Although the court in that case certified a class for a medical monitoring claim under 23(b)(1)(A), the defendant in that case had already established a medical monitoring program for diagnostic testing and research, such that "[a]ny judicially-imposed modification of th[e] program" would affect all class members. *Id.* at 285. Furthermore, the medical monitoring class sought to establish a medical monitoring *claim,* rather than seek medical monitoring as a form of relief based on a different claim. *Id.* at 278; *see also, In re Telectronics Pacing Sys., Inc.,* 168 F.R.D. at 215–16 (explaining that "California only recognizes medical monitoring as a compensable item of damage when liability is established under traditional tort theories of recovery.") (citing *Potter v. Firestone Tire and Rubber Co.,* 6 Cal.4th 965, 25 Cal. Rptr.2d 550, 577–578, 863 P.2d 795, 822–23 (1993) (in bank)). Thus, if the class prevailed on their claim, the defendant would necessarily be required to treat all class members alike, as all class members would then be eligible for the medical monitoring program by virtue of winning their medical monitoring claim. Finally, court ordered medical monitoring would have to be reconciled with the FDA's statutorily mandated oversight function, a non-issue in the current case. *Id.,* 172 F.R.D. at 285.

#### b. *Analysis*

Plaintiffs argue that 23(b)(2) class certification is proper because Plaintiffs seek "implementation of a medical monitoring program, mandatory injunctive relief and declaratory relief." Motion at 27:14–18. BNA contends, however, that Plaintiffs' request for relief in the form of a medical monitoring program is essentially one for damages, rather than injunctive relief, making 23(b)(2) treatment inappropriate. Opp. at 45:4 to 46:12. BNA directs the Court's attention to Plaintiffs' prayer for relief which seeks compensatory and punitive damages, as well as a medical monitoring program that includes a fund to pay for the treatment of diseases detected in class members. *Id.;* SAC at 51–52 (Prayer for Relief).

Plaintiffs, on the other hand, rely on various cases holding that medical monitoring may be considered a form of injunctive relief that is proper for Rule 23(b)(2) certification. Motion at 27:14 to 28:14. However, these medical monitoring programs did not involve payments by the defendants for treatment of disease, nor does it appear that the plaintiffs also sought compensatory and punitive damages from the same claims seeking medical monitoring.[23]

Plaintiffs attempt to address BNA's argument that Plaintiffs' request for medical monitoring is actually for damages by representing for the first time in their Reply that they can:

> amend their complaint to limit the scope of the medical monitoring sought to the creation of a *court supervised* program through which the class members would undergo periodic medical examinations n order to promote the early detection of diseases caused by their exposure to the hazardous substances released by defendants—while deferring for future adjudication the issue of Boeing's responsibility for the costs of treatment.

Reply at 34:18 to 35:5 (emphasis in original).

Considering Plaintiffs' burden of establishing that all of the prerequisites of Rule 23 have been met, the Court will not certify Plaintiffs'

---

**23.** For example, Plaintiffs rely on *Day v. NLO, Inc.*, 144 F.R.D. 330, 336 (S.D.Ohio 1992), which held that a court-established medical monitoring program managed by court-appointed, court-supervised trustees for the purpose of monitoring plaintiffs and sharing information regarding diagnoses is a proper form of injunctive relief for 23(b)(2) class certification. However, *Day* also held that moneys paid by defendants for medical monitoring, either as a lump sum of damages to plaintiffs or as payment of plaintiffs' medical expenses directly did not "constitute injunctive relief as required by Rule 23(b)(2)." *Id.* at 335.

In their SAC, however, Plaintiffs do not seek a court-established medical monitoring program solely for the purposes of diagnosing disease and sharing information with class members. Rather Plaintiffs seek the establishment of a "reserve fund to pay for the cost of the medical monitoring program," which includes medical examinations of class members, as well as treatment of disease detected in class members. SAC at 51:1–5. Plaintiffs additionally seek punitive and compensatory damages for the Class. Thus, the medical monitoring program Plaintiffs seek does not resemble that held in *Day* as appropriate injunctive relief. In fact, Plaintiffs' proposed program does not resemble any programs certified under Rule 23(b)(2). Rather, Plaintiffs' program resembles those found inappropriate under Rule 23(b)(2). *See, e.g., Barnes v. The American Tobacco Co.*, 176 F.R.D. 479, 485–90 (E.D. Pa.1997) (certifying a medical monitoring class

action under 23(b)(2) where medical monitoring was the *only claim* against defendants plaintiffs sought court-supervised program for early detection of disease and did not seek additional damages; and plaintiffs demonstrated that entitlement to medical monitoring claim could be proved on a class-wide, rather than individual basis) [Note: **This class has apparently been decertified and the case dismissed;** *See* Los Angeles Times, Oct. 18, 1997 at A10.]; *Arch,* 175 F.R.D. 469, 483–485 (finding 23(b)(2) treatment inappropriate where plaintiffs' medical monitoring program included not only periodic examinations but also a fund for treatment because the "request for treatment drastically alters the nature of the relief requested by plaintiffs ... [making it] identical to a traditional claim for personal injury"); *Haley,* 169 F.R.D. at 657 (finding 23(b)(2) certification improper for class seeking medical monitoring program and damages because medical monitoring, while not incidental to action for monetary damages, also was not the primary goal); *Yslava,* 845 F.Supp. at 708, 712 (certifying class under (b)(2) seeking court-supervised medical monitoring program to detect disease when damages plaintiffs sought were for medical monitoring costs already incurred, rather than general compensatories and punitives); *Cook,* 151 F.R.D. at 387–88 (holding class seeking medical monitoring met 23(b)(2). requirements where medical monitoring was a cause of action and plaintiffs did not appear to seek punitives).

Class based on Plaintiffs' assurances that they will amend their SAC to conform with Rule 23(b)(2)'s requirements.[24] Plaintiffs cannot simply change the focus of their requested relief on the last page of their Reply.[25]

 The Court finds Plaintiffs' current request for relief, therefore, more analogous to that in *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90 (W.D.Mo.1997), than to any of the cases Plaintiffs' rely on in their Motion. In *Smith*, the court, while recognizing that 23(b)(2) certification may include incidental monetary damages, held that 23(b)(2) treatment was inappropriate for a class requesting that defendant create a fund for medical monitoring and treatment, as well as punitive damages. The court explained that plaintiff's requested relief for medical monitoring "is in the form of money which, along with [p]laintiff's other claims for monetary relief, demonstrates that monetary relief is the predominate relief sought." *Id.* at 100. Thus, monetary relief could not be considered "incidental" so that plaintiff could establish a Rule 23(b)(2) class. *Id.* Similarly, Plaintiffs in this action seek to establish a fund to pay for medical monitoring which includes treatment, as well as other monetary damages in the form of punitives and compensatories. It is clear to the Court, therefore, that Plaintiffs' claims for relief are not predominately for injunctive relief, but rather for monetary relief. Thus, Plaintiffs cannot maintain their Class under Rule 23(b)(2).

**24.** *Compare Castano v. The American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir.1996) (finding that the court could not "rely on assurances of counsel that any problems with predominance or superiority can be overcome," considering plaintiffs' burden).

**25.** If Plaintiffs later decide to seek relief only in the form of a court-supervised medical monitoring program for early detection of disease, rather than treatment, at that time the Court may consider Plaintiffs' request to maintain the Class under Rule 23(b)(2). However, if Plaintiffs seek monetary damages in addition to medical monitoring, then Plaintiffs must demonstrate that their request for injunctive relief constitutes the *primary* relief sought for the Class and that any monetary damages are only incidental. Current-

## 3. Rule 23(b)(3)

### a. *Standard*

A class action may be maintained under Rule 23(b)(3) if "questions of law or fact common to the members of the class predominate," and if "a class action is superior to other available methods." Thus, the party seeking certification must establish *both* predominance of common issues and superiority of the class action.

### (1) Predominance of Common Questions of Law or Fact

 "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Valentino*, 97 F.3d at 1234. Thus, the court must determine whether common issues constitute such a significant aspect of the action that "there is a clear justification for handling the dispute on a representative rather than on an individual basis." Charles Alan Wright, Arthur R. Miller & Mary Kay Kane § 1778 at 528. For the proponent to satisfy the predominance inquiry, it is not enough to establish that common questions of law or fact merely exist, as it is under Rule 23(a)(2)'s commonality requirement. *Id.* at 526–27. Although the proponent may satisfy the commonality requirement of Rule 23(a), the predominance inquiry under Rule 23(b) is much more rigorous. *Amchem Products, Inc.,* —— U.S. at ——, 117 S.Ct. at 2250. The predominance question "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at ——, 117 S.Ct. at

ly, even if Plaintiffs' medical monitoring program excluded treatment, "the primary goal" of Plaintiffs appears to be monetary damages, considering that Plaintiffs seek compensatories and punitives and that all of the named Plaintiffs currently have cancer or have relatives with cancer, causing their desire for monetary damages to outweigh their desire for a monitoring program. *See Haley*, 169 F.R.D. at 657 (holding that "[a]lthough plaintiffs claim that this request for a medical monitoring program is not merely incidental to their action for monetary damages, it seems clear that the primary goal of plaintiffs is in fact monetary damages," and that "even if the medical monitoring program is not 'incidental' to plaintiffs' action, it is definitely not the 'primary' relief either.").

2249. The court, therefore, must balance concerns regarding issues common to the class as a whole with questions affecting individual class members. *Dalkon Shield,* 693 F.2d at 856.

### (2) Superiority of Class Action

■ In addition to a predominance of common questions, the proponent must also demonstrate that the class action is the superior method of adjudication of the controversy. *See Valentino,* 97 F.3d at 1235 (explaining that the party seeking certification needs to make a "showing [as to] why the class mechanism is superior to alternative methods of adjudication"). While the 1966 Advisory Committee Notes for Rule 23 explain that mass tort actions are not " 'ordinarily appropriate' for class treatment, . . . the text of the rule does not categorically exclude mass tort cases from class certification." *Amchem Products, Inc.,* —— U.S. at ——, 117 S.Ct. at 2250; *see also Valentino,* 97 F.3d at 1230–31. Thus a class action may be superior where "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino,* 97 F.3d at 1234. However, the court must also consider other issues, such as:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.Pro. 23(b)(3).

■ For instance, the greater the number of individual issues, the more difficult it will be for the court to manage the class action. *See e.g., Dalkon Shield,* 693 F.2d at 856. Thus, a class action is improper where an individual class member would be compelled to try "numerous and substantial issues to establish his or her right to recover individually, after liability to the class is established ." Schwarzer, Tashima & Wagstaffe § 10:361. On the other hand, the fact that individual members seek separate damages is not fatal to class treatment. *Id.*

### b. *Analysis*

Plaintiffs seek to certify both the Class and Property owner Subclass under Rule 23(b)(3). The Court will examine the Class and Subclass separately to see if each satisfies the predominance criterion of Rule 23(b)(3) and will then determine if Plaintiffs have established that class adjudication is appropriate in this case.

### (1) Predominance of Issues Common to the Class

Plaintiffs contend that certification of the Class pursuant to Rule 23(b)(3) is proper because common questions of law and fact surrounding Defendants' conduct predominate over individual considerations. Motion at 29:3–10. Plaintiffs maintain that "[i]nasmuch as the claims against Defendants arise out of the same events and are based on common legal theories, the predominance of common questions of law and fact is clear." *Id.* at 29:7–9. In relation to their request for medical monitoring, Plaintiffs assert that common issues "abound," including the extent of Plaintiffs' exposure to the allegedly released substances, the toxicity of these substances, the seriousness of potential diseases, and whether it is necessary for Plaintiffs to participate in a medical monitoring program. *Id.* at 30:18–23.

■ BNA contests Plaintiffs' assertion that the above are common questions that predominate individual issues. Instead BNA argues that individual issues in fact predominate because the factors necessary to establish entitlement to medical monitoring relief will vary as to each individual class member.[26] However, Plaintiffs insist that they

---

**26.** California law recognizes recovery of costs for medical monitoring as a compensable item of damages. *Potter v. Firestone Tire and Rubber Co.,* 6 Cal.4th 965, 1005–06, 863 P.2d 795, 822–23, 25 Cal.Rptr.2d 550, 577 (1993) (*See also* footnote 22). To establish an entitlement to recovery of medical monitoring costs, the plaintiff must show that future monitoring is reasonable and necessary according to the following factors:

can establish entitlement to medical monitoring on a class-wide basis through "dose reconstruction methods that will model exposure over time for all persons in the exposed area."[27] Reply at 29:23–25.

 The Court has recognized that Plaintiffs have shown that questions of law and fact common to the Class exist regarding Defendants' alleged violations of CERCLA, whether Defendants' activities were negligent or based in strict liability, and whether Defendants released hazardous substances into the environment. However, the predominance criterion is "far more demanding" than the commonality inquiry. *Amchem Products, Inc.*, — U.S. at —, 117 S.Ct. at 2250. Thus, it is not enough that Plaintiffs have demonstrated that common issues exist. In addition, Plaintiffs must also establish that these issues *predominate* over questions that affect individual class members. The Court finds that Plaintiffs have not met this burden.

While issues surrounding Defendants' activities at the Rocketdyne Facilities are common to the Class, individual issues surrounding Plaintiffs' ability to establish entitlement to medical monitoring outweigh those common questions. Plaintiffs do not adequately explain how they will establish a common entitlement for medical monitoring on behalf of the Class. Instead, Plaintiffs argue that

> (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis.
> 
> *Id.*, 6 Cal.4th at 1009, 863 P.2d at 824–25, 25 Cal.Rptr.2d at 579–80. Thus, it is BNA's contention that the class members will be required to establish each of the above factors individually to determine if medical monitoring is in fact appropriate for each particular plaintiff. *See* Mettler Decl. ¶¶ 12–14, 27–34; James Decl. ¶ 8.

**27.** Plaintiffs have submitted declarations from *Cook* as examples of the use of this type of "dose reconstruction." Apenes Decl. Exs. 51–52. However, Dr. Jan Beyea, while describing the use of dose reconstruction to determine exposure levels class-wide, does not discuss how this meth-

individual risk factors, which are not associated with Defendants' alleged release of toxins, will not "impact upon the decision as to whether medical monitoring is appropriate for the class in the first place; they are relevant only within the confines of an individual's monitoring." Reply at 30:10–18.

BNA, however, offers evidence that a determination of class members' levels of exposure to hazardous substances is insufficient to determine if individual members are entitled to medical monitoring damages. Mettler Dec. ¶ 27. More importantly, whether an individual member of the Class is entitled to treatment under the proposed medical monitoring program will vary significantly due to proximate cause issues. Thus, questions surrounding whether Defendants' alleged releases of hazardous substances caused an individual's illness, entitling him or her to treatment, cannot be established on a class-wide basis because each claimant may have varying risk factors not associated with Defendants' conduct. Furthermore, while a jury might be able to find that Defendants have generally caused an increased risk of diseases, such as cancer, for the Class, a jury would be required to individually determine whether this increased risk actually caused the class member's illness, entitling him or her to treatment costs.[28]

od will enable Plaintiffs to establish entitlement to medical monitoring on a class-wide basis. *Id.* Ex. 51. Additionally, while Dr. Michael Gochfeld discusses the benefits of a medical monitoring program, he does not explain how a class can establish entitlement to medical monitoring relief. *Id.* Ex. 52.

**28.** *See Arch*, 175 F.R.D. 469, 488–89 (finding individual issues overwhelmed common issues because of causation problems). Plaintiffs' Class is also distinguishable from that certified in *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. at 289, where individual causation issues were straightforward and did not disrupt the Court's finding of predominance. In that case, whether the defective product caused an individual's injury was not an issue because the injury involved a direct wound to the body that could not have been made by anything else. *Id.* In fact, the court directly contrasted this type of injury with that of a "latent, difficult to diagnose disease." *Id.* While Plaintiffs have asserted throughout their Motion and Reply that the Class does not seek personal injury claims, Plaintiffs' request for a

Finally, the Court finds that the Class Plaintiffs seek to certify lacks the cohesiveness necessary to establish the predominance criterion. *Amchem,* —— U.S. at ——, 117 S.Ct. at 2249. As explained in the Court's Rule 23(a)(3) and (4) analysis, class members seeking treatment and those seeking early detection of disease have conflicting interests. Any fund established to pay for the medical monitoring program will be used both to pay for class members' treatment of disease, as well as future periodic examinations for early detection of disease in otherwise healthy class members. Exposure-only claimants' goal will be the establishment of a program that focuses on research and detection of disease with monies available for future, continuous testing. On the other hand, claimants already diagnosed with health defects will seek a program whose focus is on the immediate treatment of illness and the establishment of a fund with the aim that more monies be spent on their current expenses. These two goals contain inherent conflicts, which tend to destroy the cohesiveness of the Class.[29] For all of the above reasons, the Court finds that Plaintiffs have failed to show that issues common to the class predominate over those affecting individual class members.

### (2) Predominance of Common Issues for the Property Owner Subclass

■ As with the Class, Plaintiffs have not demonstrated how issues common to the Subclass outweigh those questions affecting individual class members. The Court's analysis of the lack of predominate common questions follows the analysis used above. Again, although common issues relating to Defendants' liability for allegedly releasing harmful substances into the environment exist for members of the Subclass, Plaintiffs have not adequately explained how these issues predominate over individualized proximate cause questions. For example, Plaintiffs have not explained how class-wide determination of exposure levels for certain areas will contend with the fact that two properties next to each other may have different contamination levels because the alleged releases of hazardous substances are affected by hills, wind, groundwater flow, etc. Thus, Plaintiffs cannot use a model to demonstrate that Defendants have caused damage to all properties within a certain area, but will have to individually examine each property.[30]

Plaintiffs also seek damages for diminution in value to Subclass members' properties due to the stigma associated with Defendants' alleged conduct. Plaintiffs offer the opinion of an expert examining the contamination area in the *Cook* case to show how this diminution in value can be established on a class-wide basis. Reply at 31:18 to 32:6. Although the *Cook* expert asserts that the "loss of property values can be evaluated on

---

medical monitoring program that provides *treatment* involves the same individualized proximate cause issues that are found in personal injury claims. *See, e.g. Dalkon Shield,* 693 F.2d at 856 (finding greater number of questions affecting individual class members because each plaintiff must also prove that defendant's breach of duty proximately caused his or her injury); *Arch,* 175 F.R.D. 469, 489–90 (holding that determination of whether medical monitoring constitutes appropriate relief "is highly individualized and militates against Rule 23(b)(3) certification").

**29.** *See Amchem,* —— U.S. at ——, 117 S.Ct. at 2250 (upholding decertification of class under 23(b)(3)'s predominance criterion because "disparate questions undermin[ed] class cohesion," such as the fact that some class members suffered from current injuries while others did not). The Supreme Court specifically notes the Third Circuit's finding that exposure-only plaintiffs shared little in common "with each other or with the presently injured class members" because it

was unclear whether and what disease they would suffer and what type of medical expenses they would incur. *Id.* (internal quotation marks omitted). The Court recognizes that *Amchem* involved the settlement of a class. However, the medical monitoring program Plaintiffs seek possesses similar problems because a fund will be established to pay for the costs of the program. Presumably this fund will not be unlimited, similar to a fund established at settlement.

**30.** Plaintiffs argue that "if contamination is proved on a class-wide basis (for example, all property within a particular range is found to have been exposed to × amount of radionuclides), then whether × amount can be abated, is a common question." Reply at 31:15–17. However, determination of exposure levels to a certain area does not mean that all properties in that area were so exposed due to the variables explained above. Abatement for property within a particular range would, thus, *not* constitute a common question.

an area-wide basis," he also explains that "[i]n a situation where an entire neighborhood or geographic area has been subject to releases of hazardous substances, the adverse effect on property values is market-wide, with properties of *like kind* affected in the same way." Apenes Decl. Ex. 53 at ¶ 6 (emphasis added). Only *similar* properties in a particular area, therefore, will share similar diminution in value. The properties encompassed in the geographic area of the Subclass, however, are *not* similar.[31] Furthermore, individual proximate cause issues permeate a diminution in value analysis because of the many diverse communities encompassed within the Subclass. For example, one community may be experiencing a drop in the real estate market due to factors unrelated to the Defendants' alleged activities. Because Plaintiffs have not demonstrated to the Court how the common issues will predominate over these very individual questions, the Court finds that Plaintiffs cannot maintain the Subclass under Rule(b)(3).

### (3) Superiority of the Class Action

The inquires surrounding predominance of common facts and superiority of the class action are intertwined. The greater the number of individual issues, the less likely that a class action is the superior method of adjudication. *Dalkon Shield*, 693 F.2d at 856. As explained above, Class and Subclass members would have to individually try substantial issues to establish their right to recover damages for medical monitoring and property damages. Because of the extent of the individual issues surrounding Plaintiffs' request for the proposed medical monitoring program and property damages, class-wide

litigation of issues common to the class will not necessarily "reduce litigation costs and promote greater efficiency," a key component of finding class treatment superior. *Valentino*, 97 F.3d at 1234.

Plaintiffs maintain that a class action is the superior method of adjudication for this action because "class-wide resolution of the issues in this case will reduce litigation costs and promote efficiency for the Court as well as the litigants." Motion at 32:20–21. Plaintiffs' assertion is based on the allegation that because "[e]vidence as to the conduct of Defendants and the release of hazardous substances into the environment will not vary from one plaintiff to the next," these issues will be repeated over and over again to the Court in individual actions absent class adjudication. *Id.* at 32:21–28. BNA claims that class action treatment is not superior because Plaintiffs have not shown how the case would be tried and the proposed classes would be unmanageable. Opp. at 39:12–28. BNA also contends that because little discovery has occurred in this action and no individual claims have yet been tried, class treatment of the case is premature.[32] *Id.* at 40 & n. 49.

■ Plaintiffs' reliance on the common issues in this action to demonstrate that a class action is superior is misplaced. As the Court has explained above, individual issues surround Plaintiffs' claims. There has been no showing by Plaintiffs of how the class trial could be conducted given these individual issues. *Valentino*, 97 F.3d at 1234. Instead, Plaintiffs in their Reply state that their "intent is to model their efforts after those being pursued in the *Cook* action wherein the

---

31. *See* Chalmers Decl. Ex. P (Analysis of Land Use by Community). The land uses within the currently defined Subclass include residential, commercial, industrial, public facility, and agriculture uses. These are not properties of "like-kind" and thus will not be affected in the same way by Defendants' alleged releases of hazardous substances. For example, an industrial property may not face any stigma problems.

32. BNA refers to the "immature tort" theory that cases with little discovery, few individual jury verdicts, and no showing that plaintiffs' claims will persist, are "not appropriate for class certification given the inherent manageability and su-

periority problems." Opp. at 40 & n. 49 (citing *Castano*, 84 F.3d at 747 where the court observed that "a mass tort cannot be properly certified without a prior track record of trials from which the district court can draw information necessary to make the predominance and superiority analysis required by Rule 23."). Considering that Plaintiffs have not provided the Court with information as to what the trial in this case will look like, the Court presently has concerns that the completion of some individual trials may be necessary for the Court to adequately determine whether class adjudication is superior.

plaintiffs are relying upon computer modeling to calculate class-wide exposure." Reply at 33:14–16. This statement does little to demonstrate how Plaintiffs will reconcile the individual issues discussed above *at trial.* The Court cannot perform an adequate superiority analysis without some type of proposed structure in which the case will be tried. *See, e.g., Valentino,* 97 F.3d at 1234; *Castano,* 84 F.3d at 744; *In re Telectronics Pacing Sys., Inc.,* 168 F.R.D. at 221. Thus, because the Court has concerns relating to the manageability of the action considering the number of individual issues involved, at this time the Court finds that class action treatment is not superior to other forms of adjudication.[33]

### III. Conclusion

For all of the reasons set forth above, the Court hereby ORDERS that Plaintiffs' Motion for Class Certification is DENIED.

**SO ORDERED.**

---

**33.** In addition, the Court is reluctant to certify the class under Rule 23(b)(3) because it has serious due process concerns about whether adequate notice can be given to class members no longer living or working in the Contamination Area "to enable them to make an intelligent choice as to whether to opt out." *Valentino,* 97 F.3d at 1234.